[No. F047855. Fifth Dist. Sept. 12, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD ENRIQUE YBARRA et al., Defendants and Appellants.

1070

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

### COUNSEL

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant Ronald Enrique Ybarra.

Sharon Giannetta Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Hugo Cernas.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Janis Shank McLean and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**GOMES, J.**—Gang warfare shootings in Fresno one night led to verdicts finding two members of the Floradora Street Bulldogs criminal street gang— Hugo Cernas and Ronald Enrique Ybarra—guilty, inter alia, of the first degree special-circumstance murder of a man who was not a gang member and the willful, deliberate, and premeditated attempted murders of a pregnant woman and another man, neither of whom was a gang member either. The parties argue evidentiary, ineffective assistance of counsel, instructional, juror misconduct, and sentencing issues on appeal. We will vacate both sentences and remand both matters to the trial court for resentencing but otherwise will affirm both judgments.

### FACTUAL HISTORY

On October 5, 2001,[1] shortly after 7:00 p.m., someone in a BMW yelled out to Ybarra, "What's up Sur?" Ybarra yelled back, "Bulldog." From inside

---

[1] All later references to dates are to 2001 unless otherwise noted.

the BMW, someone fired several shots at him from a handgun at point-blank range but missed him. Sur is short for Sureños, a rival criminal street gang.

Shortly after 9:30 that evening, Ybarra, Cernas, and another male, all armed with guns, stepped out of a large car "between a gray and a blue" in color, walked toward a house that was "a perceived Sureño location" where Gilbert Medrano, his pregnant niece Mercedes López, and his friend Álvaro Romero were sitting outside talking, and opened fire. Ybarra's father owns a sky blue Lincoln Town Car.

Bullets struck Medrano in the face, López in the leg and stomach, and Romero twice in the back and once in the hip. Medrano survived with a bullet lodged between his cervical vertebrae. López, who had a Caesarian section and a hysterectomy, and her daughter, who was born a month prematurely with a scratch mark from a bullet on her back, both survived. Romero died at the scene. A gang expert characterized both shootings as gang warfare between Bulldogs and Sureños.

## PROCEDURAL HISTORY

In count 1, a jury found Cernas and Ybarra guilty of the first degree murder (Pen. Code, § 187, subd. (a))[2] of Romero, found true as to each the allegations of intentional murder by an active criminal street gang member (§ 190.2, subd. (a)(22)), personal use of a firearm (§ 12022.5, subd. (a)(1)), and commission of the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)), and found true as to Cernas only the allegation of personal and intentional discharge of a firearm proximately causing great bodily injury or death (§ 12022.53, subd. (d)).

In counts 2 and 3, the jury found Cernas and Ybarra guilty of the willful, deliberate, and premeditated attempted murders (§§ 187, subd. (a), 664) of López and Medrano, respectively, and found true as to each the allegations of personal use of a firearm (§ 12022.5, subd. (a)(1)) and commission of the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)). In count 4, the jury found Cernas and Ybarra guilty of active participation in a criminal street gang. (§ 186.22, subd. (a).)

On count 1, the trial court sentenced Cernas to a term of life without possibility of parole (LWOP) for intentional murder by an active criminal street gang member (§§ 187, subd. (a), 190.2, subd. (a)(22)) and to a consecutive term of 25 years to life for personal and intentional discharge of a firearm proximately causing great bodily injury or death (§ 12022.53,

---

[2] All statutory references are to the Penal Code unless otherwise noted.

subd. (d)) and imposed and stayed a consecutive aggravated term of 10 years for personal use of a firearm (§§ 654, 12022.5, subd. (a)(1)) and a consecutive term of 10 years for commission of a violent felony by a criminal street gang member (§§ 186.22, subd. (b)(1)(C), 654). On counts 2 and 3, the trial court sentenced him in each count to a consecutive term of life with possibility of parole for willful, deliberate, and premeditated attempted murder (§§ 187, subd. (a), 664) without parole until after service of a minimum of 15 years (§ 186.22, subd. (b)(5)) and to a consecutive aggravated term of 10 years for personal use of a firearm (§ 12022.5, subd. (a)(1)) and imposed and stayed a consecutive term of 10 years for commission of a violent felony by a criminal street gang member (§§ 186.22, subd. (b)(1)(C), 654). On count 4, the trial court imposed and stayed a consecutive aggravated term of three years for active participation in a criminal street gang. (§§ 186.22, subd. (a), 654.) In addition, the trial court, inter alia, imposed a $10,000 restitution fine (§ 1202.4) and a $10,000 parole revocation fine (§ 1202.45) with a stay on the latter fine pending parole revocation.

On count 1, the trial court sentenced Ybarra to a term of LWOP for intentional murder by an active criminal street gang member (§§ 187, subd. (a), 190.2, subd. (a)(22)) and to a consecutive aggravated term of 10 years for personal use of a firearm (§ 12022.5, subd. (a)(1)) and imposed and stayed a consecutive term of 10 years for commission of a violent felony by a criminal street gang member (§§ 186.22, subd. (b)(1)(C), 654). On counts 2 and 3, the trial court sentenced him in each count to a consecutive term of life with possibility of parole for willful, deliberate, and premeditated attempted murder (§§ 187, subd. (a), 664) without parole until after service of a minimum of 15 years (§ 186.22, subd. (b)(5)) and to a consecutive aggravated term of 10 years for personal use of a firearm (§ 12022.5, subd. (a)(1)) and imposed and stayed a consecutive term of 10 years for commission of a violent felony by a criminal street gang member (§§ 186.22, subd. (b)(1)(C), 654). On count 4, the trial court imposed and stayed a consecutive aggravated term of three years for active participation in a criminal street gang. (§§ 186.22, subd. (a), 654.) In addition, the trial court, inter alia, imposed a $10,000 restitution fine (§ 1202.4) and a $10,000 parole revocation fine (§ 1202.45) with a stay on the latter fine pending parole revocation.

## ISSUES ON APPEAL

Cernas and Ybarra argue two evidentiary issues on appeal. (1) The presence within sight of the jury of a section 868.5 support person during the testimony of three prosecution witnesses violated the due process clause. (2) The exclusion of evidence of López's misdemeanor welfare fraud violated the confrontation and due process clauses. Additionally, (3) Ybarra argues, on the premise that the photographic lineups were impermissibly suggestive, that

his attorney's failure to object to pretrial identifications and an identification at trial constituted ineffective assistance of counsel.

Ybarra argues two instructional issues on appeal. (4) With reference to the criminal street gang crime, the trial court's failure to instruct sua sponte to view accomplice testimony with caution violated the due process clause. (5) The instruction allowing the jury to find true for an aider and abettor the special circumstance of intentional murder by an active criminal street gang member violated the due process clause. Additionally, (6) Cernas and Ybarra argue that one juror's dissuasion of another from asking the trial court for discharge as a holdout juror constituted prejudicial juror misconduct.

Cernas argues two sentencing issues on appeal. (7) The trial-court's lack of awareness of sentencing discretion to impose on the special-circumstance first degree murder a youthful offender 25 year-to-life term instead of an LWOP term requires a remand for resentencing. (8) Since the trial court imposed one firearm enhancement—personal and intentional discharge of a firearm proximately causing great bodily injury or death—and imposed and stayed another firearm enhancement—personal use of a firearm on the first degree murder—the latter must be stricken.

Together, Cernas and Ybarra argue three sentencing issues on appeal. (9) On the premise that the criminal street gang crime is a lesser included offense of the functional equivalent of the single greater crime of first degree murder with a criminal street gang enhancement, the sentence on the criminal street gang crime must be stayed. (10) The imposition of aggravated terms without jury findings on circumstances in aggravation and of consecutive terms without jury findings on criteria affecting concurrent or consecutive sentences violated the federal constitutional guarantees of jury trial and proof beyond a reasonable doubt. (11) Since neither has a sentence that includes a period of parole, the $10,000 parole revocation fines must be stricken.

## DISCUSSION

### 1. Witness Support Person

Cernas and Ybarra argue that the presence within sight of the jury of a section 868.5 support person during the testimony of three prosecution witnesses—López, Medrano, and Medrano's wife María (María)—violated the due process clause.[3] The Attorney General argues the contrary.

 Section 868.5 entitles a prosecuting witness in, inter alia, a murder case to the attendance at trial of one or two support persons "of his or her

---

[3] For brevity and clarity, we refer to Medrano's wife María solely by her first name. No disrespect is intended.

own choosing" while testifying. (*Id.*, subd. (a).) Only one support person may accompany the witness to the witness stand, but two are permitted in the courtroom at the same time. (*Id.*, subd. (b).) "In all cases, the judge shall admonish the support person or persons to not prompt, sway, or influence the witness in any way." (*Ibid.*) Case law uniformly rejects arguments that section 868.5 is inherently prejudicial, erodes the presumption of innocence, and impermissibly encroaches on confrontation clause and due process clause rights. (See, e.g., *People v. Johns* (1997) 56 Cal.App.4th 550, 553–556 [65 Cal.Rptr.2d 434]; *People v. Adams* (1993) 19 Cal.App.4th 412, 435–444 [23 Cal.Rptr.2d 512]; *People v. Patten* (1992) 9 Cal.App.4th 1718, 1725–1733 [12 Cal.Rptr.2d 284] (*Patten*).)

So Cernas and Ybarra argue that section 868.5 as applied here violated the due process clause. On the indisputable premise that due process requires affording the accused a fair trial by an impartial jury free from outside influences (*Sheppard v. Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507]), Cernas and Ybarra analogize the support person's role at trial here to prohibitions of routinely using shackles visible to the jury (*Deck v. Missouri* (2005) 544 U.S. 622 [161 L.Ed.2d 953, 125 S.Ct. 2007] (*Deck*)), requiring the accused to stand trial wearing identifiable prison clothing visible to the jury (*Estelle v. Williams* (1976) 425 U.S. 501 [48 L.Ed.2d 126, 96 S.Ct. 1691] (*Williams*)), allowing spectators to wear buttons visible to the jury with photographs of the deceased at a murder trial (*Musladin v. Lamarque* (9th Cir. 2005) 427 F.3d 653 (*Musladin I*)), and allowing women spectators to wear "Women Against Rape" buttons visible to the jury at a sexual assault trial (*Norris v. Risley* (9th Cir. 1990) 918 F.2d 828 (*Norris*)).

Additionally, on the premise that "the state may have a compelling interest in protecting the well-being of certain witnesses" but that "the protections given must be balanced against opposing considerations affecting the defendant" (*Patten, supra*, 9 Cal.App.4th at p. 1726), Cernas and Ybarra argue that "important individualized considerations" show a due process violation on the record here. As we noted in *Patten*, a "limitless" list of possibilities that might generate an improper influence include "the relationship of the support person to the victim-witness," "the location of the support person in relation to the victim-witness," and "whether the support person does anything that the jury could see that might interject an influence on the victim-witness or the jury such as crying, nodding the head, hand motions, etc." (*Id.* at pp. 1731–1732.)

First, two cases on which Cernas and Ybarra rely are no longer good law. After the briefing here was complete, the United States Supreme Court overruled *Musladin I* and *Norris*. (*Carey v. Musladin* (2006) 549 U.S. 70, 73–76 [166 L.Ed.2d 482, 487–489, 127 S.Ct. 649, 652–654] (*Musladin II*).) In both

cases, the Ninth Circuit had found that the state court rulings at issue were contrary to clear United States Supreme Court precedent, but *Musladin II* disclaimed federal habeas corpus jurisdiction on the ground that the high court had never established a test for inherent prejudice applicable to spectator courtroom conduct. (*Ibid.*; see 28 U.S.C. § 2254(d)(1).)

Second, the record shows that the support person was a victim advocate, not a relative, as in *Patten*, whose "possible influence on the jury by her presence as a support person was minimal since the jury was already well aware of her sympathy for [the victim-witness]." (*Patten, supra*, 9 Cal.App.4th at p. 1731.) Here, no one identified the support person to the jury as a victim advocate, as a government employee, as a relative, or in any other way. Since two of the three witnesses were husband and wife, the third was a friend, and the support person and all three witnesses were Hispanic, inferences, if any, that the jury might have drawn about her identity and relationship to the witnesses are entirely speculative.

Third, nothing in the record shows, or even intimates, that the support person did "anything that the jury could see that might interject an influence on the victim-witness or the jury." (*Patten, supra*, 9 Cal.App.4th at p. 1732.) To the contrary, the record shows that the trial court admonished the support person, out of the presence of the jury, not to "prompt, sway or influence the witness in any way," told her that her "presence is only meant to be there for moral support," and cautioned her not to "be an aid to the witness in any other way," to which she replied, "I understand." Likewise, before López, Medrano, or María testified, the record shows that the trial court informed the jury of the limited purpose of her presence: "The law provides that people who wish to provide—if a witness wishes a moral support person to be in the courtroom at the time they testify, that is provided for by code. Ms. López has asked for that, and we also, I should tell you, inform and instruct persons who do come in to provide support, moral support, they cannot in any way prompt, influence or sway the witness's testimony in any way. So that's what that person is there for."

Fourth, the record shows that the support person was somewhere "behind" López during her testimony, somewhere "next to" Medrano during his testimony, and—with no specificity at all—somewhere in court during María's testimony. In *Patten*, where the support person was "sitting unidentified in the public section of the courtroom, [where] the influence would be minimal, if any," we mused that "the closer the support person is located to the victim-witness, the higher the risk the jury might be influenced." (*Patten, supra*, 9 Cal.App.4th at p. 1732.) " 'Unlike other courtroom practices condemned in the past, such as prison clothing or shackles and gags,' " however, " 'there is nothing about a [support] person sitting quietly to the side of a

witness which is particularly distracting or likely to arouse intense feeling among jurors for a witness or against a defendant.' " (*Id.* at p. 1731, quoting *Stanger v. State* (Ind.Ct.App. 1989) 545 N.E.2d 1105, 1114, overruled on another ground by *Smith v. State* (Ind. 1997) 689 N.E.2d 1238, 1246, fn. 11.)

As the courtroom practices that *Deck* and *Williams* condemned are blatantly dissimilar to the inconsequentiality of the support person's role at trial here, so the congruence of the in-court identifications with the pretrial identifications here lays bare the insignificance of her presence at trial within sight of the jury. On that record, claims by Cernas and Ybarra of hesitancies and inconsistencies in the pretrial identifications go to the weight of the evidence but not to the issue of the support person's presence at trial. "One asserting prejudice has the burden of proving it; a bald assertion of prejudice is not sufficient." (*People v. Johnson* (1988) 47 Cal.3d 576, 591 [253 Cal.Rptr. 710, 764 P.2d 1087], abrogated on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 752–754 [80 Cal.Rptr.2d 734, 968 P.2d 445], as stated in *People v. Hunter* (2006) 140 Cal.App.4th 1147, 1153, fn. 2 [45 Cal.Rptr.3d 216].) Cernas and Ybarra fall short of discharging that burden.[4]

### 2. *Impeachment Evidence*

Cernas and Ybarra argue that the exclusion of evidence of López's misdemeanor welfare fraud violated the confrontation and due process clauses. The Attorney General argues the contrary.

After López took the stand, Cernas requested that the trial court admit evidence to impeach her testimony with acts of welfare fraud that led to her entering a misdemeanor plea, attending a class, and making restitution and, ultimately, to the trial court's dismissing the charge against her.[5] Noting that she suffered no conviction, that she had no perception of "any benefit for testifying," and that the trial court preferred to "generally deny admissibility of *Wheeler*[6] evidence because it tries a case within a case," the trial court

---

[4] The law neither does nor requires idle acts (Civ. Code, § 3532), and an attorney has no duty to make a futile request (*People v. Anderson* (2001) 25 Cal.4th 543, 587 [106 Cal.Rptr.2d 575, 22 P.3d 347]), so we reject out of hand Cernas and Ybarra's concomitant argument of ineffective assistance of counsel for failure to object.

[5] Acknowledging he did not join in Cernas's request at trial, Ybarra argues he had no duty to do so since the trial court's denial of Cernas's request invoked the rule that the law does not require "futile rituals to preserve a claim for appeal." (See, e.g., *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Without adjudicating his invocation of that rule, we deem our holding equally applicable to him and reject his concomitant argument of ineffective assistance of counsel out of hand.

[6] *People v. Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938] (*Wheeler*), superseded by statute on another point as stated in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459–1460 [119 Cal.Rptr.2d 272].

denied the request. By so ruling, Cernas and Ybarra argue, the trial court "effectively substituted its judgment for that of the California Supreme Court, which held in [*Wheeler*, which discusses Evidence Code section 787 at length,] that misdemeanor acts of moral turpitude are admissible for impeachment, subject to a trial court's exercise of discretion under Evidence Code section 352." Cernas and Ybarra argue that the trial court "appears to have preferred Evidence Code section 787, which [*Wheeler*] held no longer precludes the use of relevant misdemeanor conduct for impeachment in criminal proceedings."[7]

In ruling on an Evidence Code section 352 objection, the trial court need neither expressly weigh prejudicial effect against probative value nor expressly announce compliance with the statute. (*People v. Mendoza* (2000) 24 Cal.4th 130, 178 [99 Cal.Rptr.2d 485, 6 P.3d 150].) The trial court's ruling, which followed hard on the heels of a colloquy among court and counsel about Evidence Code section 352, shows the requisite understanding of and compliance with the statute (see *People v. Riel* (2000) 22 Cal.4th 1153, 1187–1188 [96 Cal.Rptr.2d 1, 998 P.2d 969]): "The court *in its discretion* may exclude evidence if its *probative value* is substantially outweighed by the *probability* that its admission will (a) *necessitate undue consumption of time* or (b) *create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.*" (Evid. Code, § 352, italics added.)

 The trial court retains wide latitude to restrict cross-examination of an adverse witness on Evidence Code section 352 grounds without running afoul of the confrontation clause. (*People v. Harris* (1989) 47 Cal.3d 1047, 1090–1091 [255 Cal.Rptr. 352, 767 P.2d 619], disapproved on another ground in *Wheeler, supra,* 4 Cal.4th at p. 299, fn. 10; see generally *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 106 S.Ct. 1431].) That is consistent with the trial court's statutory duty to "exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth" as possible. (Evid. Code, § 765, subd. (a).) The law entrusts the trial court with the general responsibility to exercise reasonable control over the proceedings: "It shall be the duty of the judge to control all proceedings during the trial,

---

[7] With no citation to the record, Cernas and Ybarra complain about the trial court's comments on another day about that ruling. That violates the rule of court that requires "[e]ach brief" to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(C) (rule 8.204(a)(1)(C)).) We interpret that casual treatment as reflecting a lack of reliance on that aspect of their argument, which we have no duty to consider. (*In re Keisha T.* (1995) 38 Cal.App.4th 220, 237, fn. 7 [44 Cal.Rptr.2d 822]; *In re David L.* (1991) 234 Cal.App.3d 1655, 1661 [286 Cal.Rptr. 398].) Since Cernas and Ybarra's violation of rule 8.204(a)(1)(C) likewise denies the Attorney General the necessary citation to the record, he understandably does not address that aspect of their argument, either.

and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.)

On appeal, an Evidence Code section 352 ruling is subject to the deferential abuse of discretion standard of review. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Only if the record shows an exercise of discretion in an arbitrary, capricious, or patently absurd manner that caused a manifest miscarriage of justice will an Evidence Code section 352 ruling be overturned. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

Here, Medrano and María identified Cernas and Ybarra at trial as perpetrators. López identified Cernas, but not Ybarra. On the key issue of identity, on which Cernas and Ybarra focus, López's testimony with reference to Cernas was cumulative to Medrano's and María's and with reference to Ybarra was tangential in comparison with both Medrano's and María's. That record precludes Cernas and Ybarra from making the requisite showing not only for us to overturn the trial court's ruling on the basis of Evidence Code section 352 but also for us to discern the fundamental lack of fairness necessarily implicit in any violation of the due process clause.[8] (See *People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 919–920.) Since trial courts traditionally retain the intrinsic power in the interests of orderly procedure and avoidance of prejudice to control the admission of evidence through the exercise of discretion, as a general matter the rules of evidence do not impermissibly infringe on an accused's constitutional rights. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611 [25 Cal.Rptr.2d 390, 863 P.2d 635].) That is so here.

### 3. *Photographic Lineups*

On the premise that the photographic lineups were impermissibly suggestive, Ybarra argues that his attorney's failure to object to pretrial identifications and an identification at trial constituted ineffective assistance of counsel. The Attorney General disputes the premise and argues the contrary.

Hours after he was shot, Medrano looked at a six-pack photographic lineup that a detective showed him at the hospital. He had a tube down his throat, his face was "very swollen," and he could not speak, but he was coherent and responsive. Asked if he could identify anyone in the lineup as one of his

---

[8] So we reject out of hand Cernas and Ybarra's concomitant argument of ineffective assistance of counsel for failure to object on constitutional grounds. (See *People v. Anderson, supra,* 25 Cal.4th at p. 587; Civ. Code, § 3532.)

assailants, he responded affirmatively by moving his head up and down, by writing "kinda" on a piece of paper, and by pointing to Ybarra's photograph in position 2.

At the hospital two days later, the detective showed Medrano a lineup different in two respects from the one before. First, Ybarra's photograph, though in the same position as before, was newer than the one in the previous lineup. Second, the newer photograph used to show a Bulldogs gang tattoo on Ybarra's forehead, so the detective obliterated with dark ink that portion of his head and the identical portions of the other five heads. Medrano pointed to Ybarra's photograph in position 2 again and "said that this person looked like the person who was holding the shotgun."

An appellate court will set aside "convictions based on eyewitness identification at trial following a pretrial identification by photograph" only if the pretrial procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 88 S.Ct. 967].) The standard of independent review applies to a trial court's ruling that a pretrial identification procedure was not impermissibly suggestive. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608–609 [31 Cal.Rptr.3d 160, 115 P.3d 472].)

■ The Attorney General characterizes the photographs in both lineups as showing "what appear to be young male Hispanics" who were "similar in appearance, age, and [the] physical characteristics" of "shaved heads, heavy builds, and some facial hair." We agree. Where photographs in a lineup are of males of the same ethnicity and "generally of the same age, complexion, and build, and generally resembling each other," and where the accused's "photograph did not stand out, and the identification procedure was sufficiently neutral," the lineup is not impermissibly suggestive. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1208, 1214, 1217 [14 Cal.Rptr.2d 702, 842 P.2d 1]; see *People v. Gordon* (1990) 50 Cal.3d 1223, 1243 [270 Cal.Rptr. 451, 792 P.2d 251], disapproved on another ground in *People v. Edwards* (1991) 54 Cal.3d 787, 834–835 [1 Cal.Rptr.2d 696, 819 P.2d 436].) The record belies Ybarra's argument that showing Medrano a second lineup two days after the first lineup "with a different photograph of Ybarra but with all of the same decoys that he had already rejected" "telegraphed to [him] that Ybarra was the suspect they wanted him to positively identify." Since our independent review of the record persuades us that Ybarra fails to make the requisite showing on appeal that the photographic lineups were impermissibly suggestive (see *People v. Kennedy, supra,* 36 Cal.4th at p. 608), Ybarra's attorney had no duty to object to the photographic lineups or to the in-court identification, so for want of a valid premise we reject his ineffective assistance of counsel argument (see *People v. Anderson, supra,* 25 Cal.4th at p. 587; Civ. Code, § 3532).

### 4. *Accomplice Testimony Instruction*

Ybarra argues with reference to the active participation in a criminal street gang crime that the trial court's failure to instruct sua sponte to view accomplice testimony with caution violated the due process clause. The Attorney General argues the contrary.

Some preliminary comments about statutory construction are in order. The evidence at issue here is not accomplice *testimony* but *prior inconsistent statements* of accomplices in the testimony of a homicide detective, so section 1111, on which Ybarra relies, is facially inapplicable:

"A conviction can not be had upon the *testimony of an accomplice* unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the *testimony of the accomplice* is given." (§ 1111, italics added.)

Nonetheless, the Supreme Court has invoked "the basic principle that legislative intent prevails over literal construction" to hold that an accomplice's prior inconsistent statement is testimony within the scope of section 1111 (*People v. Belton* (1979) 23 Cal.3d 516, 526 [153 Cal.Rptr. 195, 591 P.2d 485]): "When it enacted section 1111 in 1872, the Legislature could not have envisioned the admissibility of evidence of an accomplice's out-of-court statement for any purpose other than to attack the credibility of the accomplice as a witness. However, when the Legislature did enlarge the purposes for which such evidence could be admitted with the enactment of Evidence Code section 1235,[9] it neglected, through apparent oversight, to substitute a more inclusive word for the term 'testimony' so that section 1111 might clearly be applicable to this new form of accomplice evidence."

So section 1111 applies "to an accomplice's out-of-court statements when such statements are used as substantive evidence of guilt." (*People v. Andrews* (1989) 49 Cal.3d 200, 214 [260 Cal.Rptr. 583, 776 P.2d 285].) Since the parties agree, and we concur, that the prosecutor used as substantive evidence of guilt the prior inconsistent statements of two Floradora gang members, José Páez and Robert Tunchez, whom Ybarra characterizes as his accomplices, the trial court had a sua sponte to instruct the jury to view those

---

[9] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

statements with caution if and only if Páez and Tunchez were "liable to prosecution for the identical offense charged against [Ybarra]." (*People v. Guiuan* (1998) 18 Cal.4th 558, 579, fn. 1 [76 Cal.Rptr.2d 239, 957 P.2d 928]; see, e.g., CALJIC No. 3.18.)

The evidentiary foundation of Ybarra's argument is clear. His father testified that Ybarra came home sometime after 7:00 p.m. on October 5 and stayed home for the entire evening. Tunchez testified that someone fired shots in his direction from a car one night but that he did not remember if Ybarra was with him. He also testified that he pled guilty to assault with a deadly weapon after a different incident involving gunfire from a car in which he alternately admitted and denied he was present with Cernas and Ybarra.

Páez testified that he and Cernas met at Raúl Ortíz's house around 5:00 or 6:00 p.m. on October 5, went out and stole a pickup truck, and drove back to Ortíz's house, that when he and Ortíz went out to buy marijuana Cernas was at Ortíz's house, and that he and Ortíz were stopped on foot and Ortíz was cited by the police for possession around 9:50 p.m. Páez also testified that he did not remember telling detectives that Ybarra was at Ortíz's house that night.

A homicide detective testified to pretrial statements by both Páez and Tunchez. She testified that Tunchez told her that he was with Ybarra when someone fired shots from a car and that he and Ybarra hung out afterward at Ortíz's house with other gang members. She testified that Páez told her that Ybarra was at Ortíz's house with him and other gang members around 9:00 or 10:00 p.m. on October 5.

With reference to the law, Ybarra argues, on the premise that his fellow gang members Páez and Tunchez were accomplices within the meaning of section 1111, that "the court had a *sua sponte* duty to instruct the jury on the rules governing accomplice testimony and statements." The Attorney General counters that "there was no evidence to suggest that Páez or Tunchez aided [Ybarra] in the commission of the charged offenses." Ybarra replies that it "does not matter that Páez and Tunchez were liable for prosecution based on criminal acts different from those alleged against [him]" and cites *People v. Felton* (2004) 122 Cal.App.4th 260 [18 Cal.Rptr.3d 626] for the proposition that under section 1111 " 'accomplice' is not synonymous with aider and abettor; a perpetrator can be an accomplice." (122 Cal.App.4th at p. 269.) On the record here, Ybarra's parsing of the statute yields nothing but a distinction without a difference.

By statutory definition, Páez and Tunchez were Ybarra's accomplices if and only if they were "liable to prosecution for the identical offense charged

against [him] in the cause in which the testimony of the accomplice is given." (§ 1111.) If they were his accomplices, then the issue whether they were perpetrators or aiders and abettors is irrelevant. (*People v. Felton, supra,* 122 Cal.App.4th at p. 269.) Although Ybarra argues that the evidence "established that both Páez and Tunchez engaged in felonious conduct while gang members," the record nonetheless lacks the evidence of each and every element of either Páez's or Tunchez's active participation in a criminal street gang necessary to characterize the testimony of either as accomplice testimony. (See, e.g., *People v. Robles* (2000) 23 Cal.4th 1106, 1115 [99 Cal.Rptr.2d 120, 5 P.3d 176]; *People v. Schoppe-Rico* (2006) 140 Cal.App.4th 1370, 1380 [44 Cal.Rptr.3d 896]; § 186.22, subd. (a).[10]) So the trial court had no sua sponte duty to instruct the jury to view their testimony with caution.

### 5. *Special Circumstance for Aider and Abettor*

Ybarra argues that the instruction allowing the jury to find true for an aider and abettor the special circumstance of intentional murder by an active criminal street gang member violated the due process clause. The Attorney General argues the contrary.

In the first degree murder count, the jury made some identical findings. The jury found both Cernas and Ybarra guilty of first degree murder and found true as to both the special circumstance allegation of intentional murder by an active criminal street gang member (intentional murder allegation). (§ 190.2, subd. (a)(22).) For the intentional murder allegation to apply, the authorizing statute requires that the defendant "intentionally killed the victim": "(a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (22) The defendant *intentionally killed the victim* while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22), italics added.)

From the statute's use of the active voice ("intentionally killed the victim"), not the passive voice (the victim was killed), and use of a form of the verb "kill," not a form of the verb "murder," Ybarra infers that the

---

[10] Section 186.22, subdivision (a) provides: "Any person who *actively participates* in any criminal street gang *with knowledge* that its members engage in or have engaged in *a pattern of criminal gang activity,* and who *willfully promotes, furthers, or assists* in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." (Italics added.)

intentional murder allegation "applies only when the defendant is the actual killer." (§ 190.2, subd. (a)(2).) To the contrary, the authorizing statute authorizes the allegation even if the defendant is "not the actual killer": "Every person, *not the actual killer*, who, *with the intent to kill*, aids, abets, counsels, commands, induces, solicits, requests, or assists *any actor* in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4." (§ 190.2, subd. (c), italics added.)

In the first degree murder count, the jury made some dissimilar findings, too. The jury found true as to Cernas, but found not true as to Ybarra, the allegation of personal and intentional discharge of a firearm proximately causing great bodily injury or death (firearm allegation). (§ 12022.53, subd. (d).)[11] From those findings, Ybarra infers that he was not the actual killer and that CALJIC No. 8.80.1 incorrectly allowed the jury to find true as to him the intentional murder allegation. Yet CALJIC No. 8.80.1 informed the jury, inter alia, as follows: "However, if you find that a defendant was *not the actual killer* of a human being or if you are unable to decide whether the defendant was the actual killer or an aider and a bitter [*sic*], you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant *with the intent to kill* aided, abetted, counseled, commanded, induced, solicited, requested or assisted *any actor* during the commission of the murder in the first degree." (Italics added.)

In short, by finding both Cernas and Ybarra guilty of first degree murder, by finding true as to Cernas and Ybarra the intentional murder allegation, and by finding true as to Cernas but not true as to Ybarra the firearm allegation, the jury found that both Cernas and Ybarra had "the intent to kill," that Cernas was the "actor" who "intentionally killed the victim," and that Ybarra was the aider and abettor who "intentionally killed the victim." Since neither the statutes nor the instruction that Ybarra parses are ambiguous, no judicial construction is necessary. (*People v. Johnson* (2002) 28 Cal.4th 240, 244 [121 Cal.Rptr.2d 197, 47 P.3d 1064].) "One asserting prejudice has the burden of proving it; a bald assertion of prejudice is not sufficient." (*People v. Johnson, supra,* 47 Cal.3d at p. 591.) Ybarra fails to discharge his burden.

---

[11] Section 12022.53, subdivision (a)(1) provides: "(a) This section applies to the following felonies: [¶] (1) Section 187 (murder)." Section 12022.53, subdivision (d) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), . . . personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

### 6. *Juror Conduct*

Cernas and Ybarra argue that one juror's dissuasion of another from asking the trial court for discharge as a holdout juror constituted prejudicial juror misconduct. The Attorney General argues the contrary.

During the hiatus between the verdicts and the sentencing hearing, the trial court received an anonymous letter from a "concerned citizen" purporting to narrate charges of jury bias by someone whom the writer identified as a friend who was a juror at Cernas and Ybarra's trial. At the trial court's invitation, the juror appeared for in camera questioning by the trial court with counsel present. She said that after initial balloting showed nine votes for conviction and three votes (including hers) for acquittal a majority juror said the minority jurors were playing "the devil's advocate," which to her "was like the devil's helper," and that no one changed anyone's mind. She characterized the deliberations as "intense" and the majority jurors and herself alike as "mad." She described the tone of the majority jurors as " 'Hurry up and just say yes' " and the response of the minority jurors as acquiescence "little by little" in the will of the majority jurors. She said she "wanted to get out of it" but said nothing after a juror who had been a juror before told her "it would not be easy to get out of it" and the judge "would send [her] back and start deliberating more." At the end of the in camera questioning, Cernas and Ybarra made a motion for a new trial on the ground of juror misconduct. Finding no prejudice, the trial court denied the motion.

"Jurors may be expected to disagree during deliberations, even at times in heated fashion." (*People v. Orchard* (1971) 17 Cal.App.3d 568, 574 [95 Cal.Rptr. 66] (*Orchard*).) Quoting *Orchard* with approval, the Supreme Court called "particularly harsh and inappropriate" a majority juror's alleged death threat to a lone holdout juror but emphasized "no reasonable juror could have taken it literally. Manifestly, the alleged 'death threat' was but an expression of frustration, temper, and strong conviction against the contrary views of another panelist." (*People v. Keenan* (1988) 46 Cal.3d 478, 541 [250 Cal.Rptr. 550, 758 P.2d 1081] (*Keenan*).) Here, the record shows that at the polling of the jury the juror at issue answered, "Yes," to the question whether those were her verdicts as read. Likewise, at the polling of the jury in *Keenan* the lone holdout juror signified that the verdict "was her individual verdict." (*Id.* at p. 542.)

Ybarra argues, primarily in reliance on *In re Stankewitz* (1985) 40 Cal.3d 391 [220 Cal.Rptr. 382, 708 P.2d 1260] (*Stankewitz*), that the juror who had been a juror before "was not an expert of judicial practices" and that he "committed misconduct by asserting such expertise." The juror in *Stankewitz* "advised the other jurors that he had been a police officer for over 20 years;

that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it; and that as soon as petitioner took the wallets at gunpoint in this case he committed robbery, whether or not he intended to keep them." (*Id.* at p. 396.) That juror " 'consulted' his own outside experience as a police officer on a question of law," gave "legal advice" that was "totally wrong," and, "vouching for its correctness on the strength of his long service as a police officer," did not "keep his erroneous advice to himself" but "stated it again and again to his fellow jurors." (*Id.* at pp. 399–400.) The Supreme Court found prejudice. (*Ibid.*)

*Stankewitz* is inapposite. The record here shows that the juror who had been a juror before professed no expertise in judicial practices but simply expressed an opinion on the basis of a life experience he had had. "The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the trial court. Such a weakness, however, must be tolerated." (*People v. Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676].)

The governing standard on appeal is independent review, as a mixed question of law and fact, of the trial court's finding. (*People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5 [66 Cal.Rptr.2d 454, 941 P.2d 87] (plur. opn. of George, C. J.).) On the basis of admissible evidence in the juror's responses to the trial court's questioning (see Evid. Code, § 1150, subd. (a)), and applying the governing standard of review, we conclude that the trial court's finding of no prejudice is correct on the law and the facts alike.

### 7. Youthful Offender Discretion

Cernas argues that the trial court's lack of awareness of sentencing discretion to impose on the special-circumstance first degree murder a youthful offender 25 year-to-life term instead of an LWOP term requires a remand for resentencing. The Attorney General argues that Cernas fails to discharge his burden of showing the trial court's lack of awareness of that discretion.

██ Like the probation officer's report, Cernas's testimony at trial shows he was 17 years old on October 5. The record of the sentencing hearing is silent about that. The statutory penalty for a person who commits special-

circumstance first degree murder and "who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime" is "confinement in the state prison for life without the possibility of parole or, *at the discretion of the court*, 25 years to life." (§ 190.5, subd. (b), italics added.) Case law characterizes section 190.5, subdivision (b) as authorizing "a presumptive penalty of LWOP for a 16- or 17-year-old special circumstances murderer, 'or, at the *discretion of the court*, 25 years to life.' " (*People v. Guinn* (1994) 28 Cal.App.4th 1130, 1145 [33 Cal.Rptr.2d 791].) The statute "does not involve two equal penalty choices, neither of which is preferred. The enactment by the People evidences a preference for the LWOP penalty." (*Ibid.*)

Despite that statutory preference, section 190.5, subdivision (b) requires "a *proper exercise of discretion in choosing whether to grant leniency* and impose the lesser penalty of 25 years to life for 16- or 17-year-old special circumstance murderers. The choice whether to grant leniency of necessity involves an assessment of what, in logic, would mitigate or not mitigate the crime. The factors listed in [former] rules 421[12] and 423,[13] implementing the determinate sentencing law, do not lose their logical relevance to the issue of mitigation merely because this is not a determinate sentencing matter." (*People v. Guinn, supra*, 28 Cal.App.4th at p. 1149.)

California Rules of Court, rule 4.421 sets out 17 circumstances in aggravation:

"(a) Facts relating to the crime, whether or not charged or chargeable as enhancements, include the fact that:

"(1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness;

"(2) The defendant was armed with or used a weapon at the time of the commission of the crime;

"(3) The victim was particularly vulnerable;

"(4) The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission;

"(5) The defendant induced a minor to commit or assist in the commission of the crime;

---

[12] Former California Rule of Court, rule 421, is now rule 4.421 (rule 4.421).

[13] Former California Rule of Court, rule 423, is now rule 4.423 (rule 4.423).

"(6) The defendant threatened witnesses, unlawfully prevented or dissuaded witnesses from testifying, suborned perjury, or in any other way illegally interfered with the judicial process;

"(7) The defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed;

"(8) The manner in which the crime was carried out indicates planning, sophistication, or professionalism;

"(9) The crime involved an attempted or actual taking or damage of great monetary value;

"(10) The crime involved a large quantity of contraband; and

"(11) The defendant took advantage of a position of trust or confidence to commit the offense. [¶] . . . [¶]

"(b) Facts relating to the defendant include the fact that:

"(1) The defendant has engaged in violent conduct that indicates a serious danger to society;

"(2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness;

"(3) The defendant has served a prior prison term;

"(4) The defendant was on probation or parole when the crime was committed; and

"(5) The defendant's prior performance on probation or parole was unsatisfactory. [¶] . . . [¶]

"(c) Any other facts statutorily declared to be circumstances in aggravation."

Rule 4.423 sets out 15 circumstances in mitigation:

"(a) Facts relating to the crime include the fact that:

"(1) The defendant was a passive participant or played a minor role in the crime;

"(2) The victim was an initiator of, willing participant in, or aggressor or provoker of the incident;

"(3) The crime was committed because of an unusual circumstance, such as great provocation, that is unlikely to recur;

"(4) The defendant participated in the crime under circumstances of coercion or duress, or the criminal conduct was partially excusable for some other reason not amounting to a defense;

"(5) The defendant, with no apparent predisposition to do so, was induced by others to participate in the crime;

"(6) The defendant exercised caution to avoid harm to persons or damage to property, or the amounts of money or property taken were deliberately small, or no harm was done or threatened against the victim;

"(7) The defendant believed that he or she had a claim or right to the property taken, or for other reasons mistakenly believed that the conduct was legal;

"(8) The defendant was motivated by a desire to provide necessities for his or her family or self; and

"(9) The defendant suffered from repeated or continuous physical, sexual, or psychological abuse inflicted by the victim of the crime; and the victim of the crime, who inflicted the abuse, was the defendant's spouse, intimate cohabitant, or parent of the defendant's child; and the facts concerning the abuse do not amount to a defense. [¶] . . . [¶]

"(b) Facts relating to the defendant include the fact that:

"(1) The defendant has no prior record, or has an insignificant record of criminal conduct, considering the recency and frequency of prior crimes;

"(2) The defendant was suffering from a mental or physical condition that significantly reduced culpability for the crime;

"(3) The defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process;

"(4) The defendant is ineligible for probation and but for that ineligibility would have been granted probation;

"(5) The defendant made restitution to the victim; and

"(6) The defendant's prior performance on probation or parole was satisfactory."

█ In addition to the circumstances in aggravation and mitigation in rules 4.421 and 4.423, respectively, "the factors stated in section 190.3 are available, to the extent relevant to an exercise of discretion to grant leniency, as guidelines under section 190.5." (*People v. Guinn, supra*, 28 Cal.App.4th at pp. 1142–1143.) Section 190.3 sets out 11 factors:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the [e]ffects of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

The probation officer's report noted that the jury found Cernas committed the murder "pursuant to Penal Code Section 190.2(a)(22), that the murder was intentional, and [he was an] active participant[] in a criminal street gang as defined in Penal Code Section 186.22(f), which would establish the sentence to be life without the possibility of parole." At the sentencing hearing, the trial court acknowledged having "read and considered" the probation officer's report.

Invited by the trial court to make "additions or corrections to the content of the report," both counsel answered in the negative. The trial court announced that, apart from a custody credits error, its "intended decision" was to "follow the recommendation" in the probation officer's report and asked counsel, "Does either side wish to be heard?" Cernas's attorney requested that, "if the Court has the inherent power to strike the special circumstances, to do so." The prosecutor responded that Cernas's "multiple crimes" and his "violence, callousness, and apparent lack of remorse" "earned him what he's going to be getting today." "With regard to the request for [*sic*] motion to strike, that is denied," the trial court ruled, "essentially for the reasons set forth" (inferentially in the probation officer's report) that "the gravity of the current offense certainly doesn't merit it." The trial court then imposed an LWOP term for the special circumstance first degree murder.

Contrary to the premise of Cernas's motion to strike, the trial court has no "inherent power" to strike the special circumstance. Over a decade and a half ago, the electorate passed Proposition 115, an initiative measure that, inter alia, expressly denied the trial court that power: "Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive." (§ 1385.1.) "The language of the statute clearly and unmistakably prohibited" the trial court from striking the special circumstance. (*People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1283 [18 Cal.Rptr.3d 286].) Implicit in the trial court's ruling on Cernas's motion to strike and the stated reasons for so ruling is a lack of awareness by the court and counsel alike of the electorate's express elimination of the power the trial court purported to exercise. Consequently, the silence of the sentencing hearing record about Cernas's age is suggestive of a lack of awareness by the court and counsel alike of the discretion that section 190.5, subdivision (b) confers to impose on a youthful offender a 25 year-to-life term instead of an LWOP term.

■ Even "discretionary decisionmaking" is subject to "some level of review, however deferential." (*People v. Superior Court* (*Alvarez*) (1997) 14

Cal.4th 968, 977 [60 Cal.Rptr.2d 93, 928 P.2d 1171].) Since the record explicitly shows a lack of meaningful argument by counsel about the facts and the law and implicitly shows a belief by the court and counsel alike that an LWOP term was mandatory if the special circumstance were not stricken, our deferential review shows that a remand for resentencing in light of the factors in section 190.3 and the circumstances in aggravation and mitigation in rules 4.421 and 4.423, respectively, is imperative. So we will vacate the sentence and remand to the trial court with directions.[14] (§ 190.5, subd. (b).)

### 8. *Firearm Enhancements on First Degree Murder*

Originally, Cernas argued, the Attorney General agreed, and we held that since the trial court imposed one firearm enhancement—personal and intentional discharge of a firearm proximately causing great bodily injury or death (§ 12022.53, subd. (d))—and imposed and stayed another firearm enhancement—personal use of a firearm (§ 12022.5, subd. (a)(1))—the latter had to be stricken from the judgment, but the Supreme Court ordered a "grant and hold" (Cal. Rules of Court, rule 8.512(d)(2)) "pending consideration and disposition of a related issue in *People v. Gonzalez*, S149898." (*People v. Ybarra*, review granted Aug. 15, 2007, S152984.)

 After the filing of the opinion in *People v. Gonzalez* (2008) 43 Cal.4th 1118 [184 P.3d 702] (*Gonzalez*), the Supreme Court ordered a transfer without decision (Cal. Rules of Court, rule 8.528(d)) for our reconsideration in light of *Gonzalez*, which held that "after a trial court imposes punishment for the section 12022.53 firearm enhancement with the longest term of imprisonment, the remaining section 12022.53 firearm enhancements and any section 12022.5 firearm enhancements that were found true for the same crime must be imposed and then stayed." (*Gonzalez*, at p. 1123.) Cernas's argument is meritless in light of *Gonzalez*.

### 9. *Lesser Included Offense*

On the premise that the criminal street gang crime is a lesser included offense of the functional equivalent of a single greater crime of first degree murder with a criminal street gang enhancement, Cernas and Ybarra argue that the sentence on the criminal street gang crime must be stayed. The Attorney General argues the contrary.

---

[14] Our holding moots Cernas's concomitant ineffective assistance of counsel argument.

■ The United States Supreme Court characterizes a "sentence enhancement" as "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict." (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 494, fn. 19 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*); cf. *People v. Seel* (2004) 34 Cal.4th 535, 539, fn. 2 [21 Cal.Rptr.3d 179, 100 P.3d 870], citing *People v. Sengpadychith* (2001) 26 Cal.4th 316, 326 [109 Cal.Rptr.2d 851, 27 P.3d 739].) On that foundation, Cernas and Ybarra argue that "murder with a gang-killing special circumstance" is the functional equivalent of a single greater crime and that the criminal street gang crime is a lesser included offense of that crime.

The law is settled in California that "enhancement allegations are not to be considered in determining lesser included offenses" (*People v. Toro* (1989) 47 Cal.3d 966, 972 [254 Cal.Rptr. 811, 766 P.2d 577],[15] citing *People v. Wolcott* (1983) 34 Cal.3d 92, 101 [192 Cal.Rptr. 748, 665 P.2d 520]), that the sole test of a lesser included offense is whether "the statutory elements of the greater offense include all of the statutory elements of the lesser offense" (*People v. Reed* (2006) 38 Cal.4th 1224, 1227 [45 Cal.Rptr.3d 353, 137 P.3d 184]), that "if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former" (*People v. Lopez* (1998) 19 Cal.4th 282, 288 [79 Cal.Rptr.2d 195, 965 P.2d 713]), and that convictions of both a greater crime and a lesser included offense require reversal of the conviction of the latter if substantial evidence of both is in the record (*People v. Moran* (1970) 1 Cal.3d 755, 763 [83 Cal.Rptr. 411, 463 P.2d 763]; *People v. Pearson* (1986) 42 Cal.3d 351, 355 [228 Cal.Rptr. 509, 721 P.2d 595], overruled on another ground in *People v. Fields* (1996) 13 Cal.4th 289, 308, fn. 6 [52 Cal.Rptr.2d 282, 914 P.2d 832]).

■ The statutory elements of the criminal street gang crime and the criminal street gang enhancement are disparate. "Any person who *actively participates* in any criminal street gang *with knowledge* that its members engage in or have engaged in *a pattern of criminal gang activity,* and who *willfully promotes, furthers, or assists* in any felonious criminal conduct by members of that gang" commits the criminal street gang crime. (§ 186.22, subd. (a), italics added.) In contrast, "any person who is convicted of a felony committed *for the benefit of, at the direction of, or in association with* any criminal street gang, *with the specific intent to promote, further, or assist* in any criminal conduct by gang members" is punishable by the criminal street gang

---

[15] In *People v. Guiuan, supra,* 18 Cal.4th at page 568, footnote 3, the Supreme Court disapproved dictum on another point in *Toro.*

enhancement. (§ 186.22, subd. (b), italics added.) So a person can commit the crime of first degree murder with a criminal street gang enhancement without necessarily committing the criminal street gang crime.

For want of a valid premise, Cernas and Ybarra's argument fails.

10. *Imposition of Aggravated and Consecutive Terms*

Cernas and Ybarra argue that the imposition of aggravated terms without jury findings on circumstances in aggravation and of consecutive terms without jury findings on criteria affecting concurrent or consecutive sentences violated the federal constitutional guarantees of jury trial and proof beyond a reasonable doubt. The Attorney General argues the contrary.

With reference to the imposition of aggravated terms, the trial court articulated four circumstances in aggravation—discharge of a firearm, particularly vulnerable victims, planning and sophistication, and high degree of cruelty and callousness—to justify the imposition of aggravated terms on the personal use of firearm enhancements (§ 12022.5, subd. (a)(1)) and the latter three circumstances in aggravation to justify the imposition of aggravated terms on the active participation in criminal street gang crimes (§ 186.22, subd. (a)). (See Cal. Rules of Court, rule 4.421(a)(1), (2), (3), (8); cf. § 1170, subd. (b).) Later, the United States Supreme Court held that the determinate sentencing law, by permitting the imposition of an aggravated term on the basis of facts that a trial court finds true by a preponderance of the evidence instead of on the basis of facts that a jury finds true beyond a reasonable doubt, breaches the defendant's Sixth and Fourteenth Amendment rights to a jury trial. (*Cunningham v. California* (2007) 549 U.S. 270, 281 [166 L.Ed.2d 856, 864, 127 S.Ct. 856] (*Cunningham*).)

Here, the jury found true beyond a reasonable doubt as to Cernas and Ybarra alike the allegation of personal use of a firearm (§ 12022.5, subd. (a)(1)) and as to Cernas alone the allegation of personal and intentional discharge of a firearm proximately causing great bodily injury or death (§ 12022.53, subd. (d)). Those verdicts show the jury necessarily found that each "was armed with or used a weapon at the time of the commission of the crime." (Rule 4.421(a)(2).) However, each of the other three circumstances in aggravation—particularly vulnerable victims, planning and sophistication, and high degree of cruelty and callousness—is a fact that the trial court found

true by a preponderance of the evidence, not a fact that the jury found true beyond a reasonable doubt. So we will vacate the sentences and remand to the trial court with directions.

 With reference to the imposition of consecutive terms, *Cunningham* is silent. (See Cal. Rules of Court, rule 4.425.) After *Cunningham*, the California Supreme Court held that the determination whether two or more sentences should be served consecutively is a sentencing decision made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense and does not implicate the defendant's right to jury trial on facts that are the functional equivalent of elements of the offense. (*People v. Black* (2007) 41 Cal.4th 799, 823 [62 Cal.Rptr.3d 569, 161 P.3d 1130].) Cernas and Ybarra's consecutive sentence argument is meritless.[16]

### 11. *Parole Revocation Fines*

Cernas and Ybarra argue, the Attorney General agrees, and we concur that since neither has a sentence that includes a period of parole the $10,000 parole revocation fines must be stricken from the judgments. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183–1186 [83 Cal.Rptr.2d 157]; § 1202.45.) So we will vacate the sentences and remand to the trial court with directions.[17]

## DISPOSITION

Both sentences are vacated and both matters are remanded to the trial court with directions. Otherwise both judgments are affirmed.

The trial court shall hold a contested resentencing hearing to choose middle terms or aggravated terms on Cernas and Ybarra's personal use of a firearm enhancements (§ 12022.5, subd. (a)(1)), to choose middle terms or aggravated terms on Cernas and Ybarra's active participation in a criminal street gang crimes (§ 186.22, subd. (a)), and to choose a 25 year-to-life term or an LWOP term on Cernas's special circumstance first degree murder (§§ 187, subd. (a), 190.2, subd. (a)(22), 190.5, subd. (b)). The trial court shall strike Cernas's $10,000 parole revocation fine (§ 1202.45) if and only if an LWOP

---

[16] So we reject out of hand Cernas and Ybarra's concomitant ineffective assistance of counsel argument for failure to object. (See *People v. Anderson, supra*, 25 Cal.4th at p. 587; Civ. Code, § 3532.)

[17] Since the only relief we have granted is with reference to sentencing, we reject out of hand Cernas and Ybarra's cumulative prejudice argument.

term is the sentence choice on that count. The trial court shall strike Ybarra's $10,000 parole revocation fine (§ 1202.45). Finally, the trial court shall amend the abstract of judgment accordingly and shall send a certified copy to the Department of Corrections and Rehabilitation.

Vartabedian, Acting P. J., and Wiseman, J., concurred.

A petition for a rehearing was denied October 1, 2008, and appellants' petition for review by the Supreme Court was denied December 23, 2008, S167710. Werdegar, J., did not participate therein.