Filed 6/27/13  P. v. Mauricio CA2/8

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>MICHAEL ANGELO MAURICIO,<br><br>      Defendant and Appellant. | B224505<br><br>(Los Angeles County<br>Super. Ct. No. TA088962)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>[No change in the judgment] |

IT IS ORDERED that the opinion filed in the above-captioned matter on May 30, 2013, be modified as follows:

1.  On page 17, the first full paragraph, the last sentence commencing with "The interpretation of section 190.5 . . ." is deleted, and replaced with:

"The interpretation of section 190.5 in light of *Miller* remains unsettled for now and we decline to resolve the issue here."

2.  On pages 17-18, the last paragraph commencing with "We need not decide the issue. . ." is deleted and replaced with:

"*Miller* changed the focus of the sentencing decision; it "requires" trial courts "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra,* 132 S.Ct 2455, 2469, fn. omitted.)  The trial court here certainly was aware that it had discretion to impose a term of 25 years to life, rather than LWOP.  But that discretion was exercised through the LWOP presumptive sentence filter of *People v. Ybarra* , *supra*, 166 Cal.App.4th 1069, 1089 and *People v. Guinn*, *supra,* 28 Cal.App.4th 1130, 1141-1142.  We are in no position to say how *Miller* might have affected the trial court's decision; we remand only

to give the trial court the opportunity in the first instance to sentence Mauricio in light of the factors enunciated in *Miller*.  We believe this is a reasonable path to follow. We express no opinion on whether *Miller* compels a particular sentence in this case.[10,]

This modification effects no change in the judgment.

The petition for rehearing filed by Respondent on June 13, 2013, is denied.

_____

BIGELOW, P. J.                    RUBIN, J.                    FLIER, J.

---

[10]    Because we remand for resentencing we do not address Mauricio's arguments that his total sentence constitutes cruel and unusual punishment.

Filed 5/30/13 (unmodified version)
Opinion following remand from U.S. Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B224505 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA088962) |
| v. | |
| MICHAEL ANGELO MAURICIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Eleanor J. Hunter, Judge. Affirmed and remanded for resentencing.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, James William Bilderback II and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Michael Angelo Mauricio of three counts of first degree murder (Pen. Code, § 187, subd. (a))[1] arising from two separate drive-by, gang related shootings. The jury's guilty verdicts included special circumstance findings as to each count that the murder was perpetrated by means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)), that Mauricio intentionally killed the victim while an active participant in a street gang (§ 190.2, subd. (a)(22)), and that he had committed multiple murders (§ 190.2, subd. (a)(3)).  The jury further found as to each murder count that a principal had personally used a firearm (§ 12022.53, subds. (b) & (e)), personally discharged a firearm (§ 12022.53, subds. (c) & (e)) had done so causing great bodily injury and death (§ 12022.53, subds. (d) & (e)), and that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  The trial court sentenced Mauricio to three consecutive terms of life without the possibility of parole (LWOP), plus three consecutive indeterminate of term of 25 years to life, one as to each murder count, for the attached findings that a principal had personally discharged a firearm causing death.

On appeal, Mauricio contended the trial court erred in declining to exercise its discretion to sentence him to terms of 25 years to life, rather than LWOP.  In an opinion we issued on November 28, 2011, we modified various fines and fees, rejected Mauricio's contention, and affirmed his multiple LWOP sentence.  (*People v. Mauricio* (Nov. 28, 2011, B224505) [nonpub. opn.].)  The California Supreme Court denied Mauricio's petition for review.  (*People v. Mauricio* (Feb. 29, 2012, S199094) [nonpub. order].)  Mauricio filed a petition for writ of certiorari in the United States Supreme Court.  (*Mauricio v. California* (No. 11-10139.)  On June 25, 2012, the United States Supreme Court issued its decision in *Miller v. Alabama* (2012) 567 U.S. ___ ; 132 S.Ct. 2455 (*Miller*) concerning the propriety of imposing LWOP sentences upon defendants who commit LWOP imprisoning offenses when a minor.  On October 29, 2012, the United States Supreme Court granted Mauricio's petition for writ of certiorari,

---

[1]     All further references are to the Penal Code unless otherwise indicated.

vacated our November 2011 judgment, and remanded the cause to our court with directions to further consider Mauricio's sentencing arguments in light of *Miller*. We now undertake the task assigned to us by the United States Supreme Court.

## FACTS

### 1.    The Murder Near Lueders Park

On November 6, 2006, murder victim Jeffrey Shade and others were sitting around in Lueders Park in Compton.  Shade was in his mid-40's and had been affiliated with the Lueders Park Pirus, a "Bloods" street gang, throughout his adult life.  He was wearing a red bandana on his head.  At some point, Shade left on a bicycle to go to a liquor store near Rosecrans Avenue and Bradfield Avenue, about a block away.  As Shade was riding on Rosecrans back to the park, a black Impala drove by slowly, and the front passenger in the car fired four to six shots at Shade.  Shade died from a gunshot wound that entered his left side and lodged in his heart.

### 2.    The Bus Bench Shooting

On November 19, 2006, a gray, four-door vehicle drove by a bus stop bench near Rosecrans Avenue and Bradfield Avenue, and multiple gunshots were fired in the direction of Shudray Jenkins and Deaundre Hunt.  Both were killed.  Deputies from the Los Angeles County Sheriff's Department (LASD) responded to the crime scene where they recovered shotgun wadding from the bus stop bench and an adjacent planter. An eyewitness reported to deputies that the shooters were in a Taurus.  At trial, the eyewitness testified the shooters had been in an "Oldsmobile Cutlass, something along the lines of that."  Jenkins suffered three gunshot wounds and died from a fatal gunshot wound to her neck.  A bullet was recovered from that wound.  Hunt suffered seven gunshot wounds, most of which were fatal.  Five bullets, along with shotgun pellets were recovered from his body.

### 3. Mauricio's Arrest and Interviews

On December 4, 2006, LASD Deputy Albert Carrillo and his partner were driving on patrol in the area near Holly Avenue and Locust Circle in Compton when Deputy Carrillo's attention was caught by a black, four-door Chevy Impala with tinted windows stopped at the curb with only its parking lights on. As the deputies approached the Impala, Deputy Carrillo saw the vehicle was occupied "with quite a few people," and he saw that the front passenger, later identified as Daniel Riley, was holding a rifle.

Deputy Carrillo stopped near the Impala, exited his patrol car, drew his weapon, and ordered the occupants of the vehicle to show their hands. The driver, later identified as Mauricio, tried to start the car, but it shut down. Besides Mauricio and Riley in front, there were three passengers, Gerald Edwards, James Hicks, and Deonna Lewis, sitting in the back seat of the car. The deputies secured the rifle, a .223-caliber Ruger model Mini-14, and found that it was loaded. The letters "WLC" — for the Ward Lane Crips gang — was scratched into the stock. Mauricio was arrested.

On December 5, 2006, LASD Detective Peter Hecht interviewed Mauricio about what he and his companions had been doing with a rifle in the car at Holly Avenue and Locust Circle. Mauricio waived his *Miranda*[2] rights and agreed to talk to the detective. Mauricio stated that he and the others, and Victor Preciado, were members of the Ward Lane Crips. He said that they had met earlier in the day and talked about a shooting that occurred a few days earlier in which Riley's girlfriend and M.B. were shot.[3] Mauricio and the others thought that someone from the Holly Hood Pirus gang did the earlier shooting, and so they formed a plan to retaliate by shooting any Holly Hood Pirus gang member they could find. Preciado stayed behind while the others had gone to the area near Holly and Locust to look for a Holly Hood Pirus gang member to shoot.[4]

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[3]     On December 1, 2006, deputies responded to Ward Lane where they found three gunshot victims, one of whom was M.B.

Several days after interviewing Mauricio, Detective Hecht and other deputies executed a search warrant at Victor Preciado's residence. During the search, the deputies recovered .223-caliber bullets from Preciado's bedroom closet. When deputies searched a black Impala at the location, they recovered four spent .223-caliber bullet casings, one spent .380-caliber bullet casing, and two live .25-caliber bullets. The black Impala was registered to Preciado's mother.

Meanwhile, LASD Detectives Brian Schoonmaker and Kevin Lowe were investigating the November 19, 2006 double murders at the bus bench. On February 5, 2007, as part of their investigation, Detectives Schoonmaker and Lowe interviewed Mauricio at the Challenger Juvenile Camp.[5] A CD recording of the interview was played for the jury at trial. A transcript of the interview was marked as evidence and provided to the jurors to assist them in following the CD. The transcripts were collected after the CD was played, and the trial court told the jurors that "what really [was] in evidence [was] the CD itself." A detailed account of the circumstances surrounding, and the content of, Mauricio's interview on February 5, 2007, is set forth below in addressing his claim on appeal that the trial court erred in denying his objection to the interview. Reviewed under the substantial evidence test, Mauricio's final interview established that he was present at the bus bench shooting and the Lueders Park shooting, and that he had encouraged and helped in both shootings.

---

[4]    Later in December 2006, Mauricio was charged with "conspiracy." At some point before February 5, 2007, Mauricio "took a deal" for "nine months."

[5]    Between Mauricio's initial interview on December 5, 2006, shortly after his arrest, and his last interview on February 5, 2007, different deputies also interviewed Mauricio on December 21, 2006, and January 10, 2007, both times at Los Padrinos Juvenile Hall. Evidence of these two book-ended interviews was not presented at trial, and, thus, are not summarized here. The content of Mauricio's interviews on December 21, 2006, and on January 10, 2007, was developed and considered at a hearing on his objection to any use of statements from his final interview on February 5, 2007. We address the content of the in-between interviews below in addressing Mauricio's claim on appeal that his statements in his final interview on February 5, 2007, should have been excluded.

5

### 4.     The Criminal Case

In September 2007, the People filed an information charging Mauricio and Victor Preciado with the murder of Shudray Jenkins (count 2; § 187, subd. (a)), the murder of Deaundre Hunt (count 3; § 187, subd. (a)), and the murder of Jeffrey Shade (count 4; § 187, subd. (a)).[6]  Each of the three murder counts included special circumstance allegations that the murder was perpetrated by means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)), that Mauricio intentionally killed the victim while an active participant in a street gang (§ 190.2, subd. (a)(22)), and that he committed multiple murders (§ 190.2, subd. (a)(3)).  Each of the three murder counts also included allegations that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)), that a principal personally discharged a firearm (§ 12022.53, subds. (c) & (e)), that the discharge caused great bodily injury and death (§ 12022.53, subds. (d) & (e)), and that the offense was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)).

In January 2010, the charges against Mauricio were tried to a jury.[7]  The testimony of a number of eyewitnesses to the two separate shootings provided general descriptions of the incidents, i.e., a vehicle drove by and shots were fired at victims.  None of the eyewitnesses directly identified Mauricio.  Ballistics evidence established that the four spent bullet casings found in the Impala during the search at Preciado's residence, and three bullet fragments recovered from the bus bench shooting victim Hunt were fired by the Mini-14 rifle found in the car being driven by Mauricio at the time of his arrest on December 4, 2006.  Bullet fragments recovered from the other bus bench shooting victim, Jenkins, and from the body of the Lueders Park shooting victim, Shade, had similar rifling as bullets fired from the Mini-14 rifle.

---

[6]     The information originally included a count 1 alleging another murder.  That count was dismissed as to Mauricio prior to trial and is not an issue on this appeal.

[7]     Preciado was tried later in 2010, and convicted on all four murder counts.  He has a separate appeal pending in our court.  (Case No. B226362.)

Mauricio's interview of February 5, 2007, was played for the jury. Deputy Gail Durham testified as a gang expert. Mauricio did not present any defense evidence. His trial counsel argued to the jury that the case against Mauricio was "based entirely" on that interview, and that the statements that he made during that interview implicating himself in the two shootings resulted from suggestions by the interrogating officers.

The jury returned verdicts finding Mauricio guilty on all three murder counts as charged, with the special circumstance and firearm findings noted at the outset of his opinion. The trial court sentenced Mauricio as noted at the outset of his opinion. Various fines and fees were also imposed.

Mauricio filed a timely notice of appeal.

## DISCUSSION

### I.     The Interview Issue

Mauricio contends his murder convictions must be reversed because the trial court erred in denying his objection to the prosecution's use of his February 5, 2007 interview. We disagree.

#### A.  The Governing Law

Police may not interrogate a suspect who is in custody until the suspect is advised of his or her right to remain silent and right to an attorney, and the suspect knowingly and voluntarily waives those rights. (See *Miranda*, *supra*, 384 US. at p. 444; see, e.g., *People v. Bradford* (1997) 14 Cal.4th 1005, 1033.) A suspect who waives his or her *Miranda* rights retains the right to control the subjects to be discussed, and the length of the interrogation, by "cut[ting] off questioning" at any point. (See *Michigan v. Mosley* (1975) 423 U.S. 96, 103-104; see also *Berghuis v. Thompkins* (2010) 560 U.S. 370.)

In addressing whether the trial court erred in denying an objection to the use of a defendant's statements as being obtained in violation of *Miranda*, a reviewing court must accept the trial court's resolution of disputed facts, and the reasonable inferences drawn from the facts, where supported by substantial evidence; a reviewing court independently determines from the historically fixed facts whether a challenged statement was obtained in violation of *Miranda*. (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1033.)

7

**B. The Hearing on the Use of the Interviews**

Prior to trial, the prosecution signaled that it intended to introduce evidence of Mauricio's 2006 interviews of December 5 and 21 as well as his 2007 interviews on January 10 and February 5.  Mauricio's counsel argued: (1) at the time of the interviews on December 21, 2006, and January 10, 2007, Mauricio had been represented by counsel in his conspiracy case involving the Mini-14 rifle in the car he had been driving (the "conspiracy" case) and could not be interviewed in connection with that case without approval from his counsel; (2) the parallel murder investigation had a factual and contemporaneous relationship to the conspiracy case in that the rifle found in the car at the time of Mauricio's arrest was the rifle used in the two driveby shootings; (3) due to the nexus between the conspiracy and murder matters, police should not have talked to Mauricio on any subject without first obtaining approval from his counsel in the conspiracy case; (4) the police in any event did not *Mirandize* Mauricio before they interviewed him on December 21, 2006, or on January 10, 2007; and (5) the problems with the interviews on December 21, 2006, and January 10, 2007, caused a "fruit of the poisonous tree" taint for the final interview on February 5, 2007, defeating any conclusion that Mauricio gave a knowing and voluntary waiver of his *Miranda* rights for that final interview.  The trial court found that Mauricio expressly waived his *Miranda* rights at the time of his final interview on February 5, 2007, which took place after his conspiracy case was ended, and that evidence of the final interview could be used at trial by the prosecution.

On appeal, Mauricio's claim is a bit different.  He contends that he did not at the time of his final interview on February 5, 2007, waive his *Miranda* rights to talk insofar as his involvement in the murders was concerned, and that he only agreed to discuss other subjects.  We now turn to that issue.

8

### C. Forfeiture

Before taking up Mauricio's "selective *Miranda* waiver" claim of error, we must address the People's argument that Mauricio forfeited the issue he raises on appeal in that he did not assert such a ground for objection in the trial court. We agree with the People that Mauricio's claim is forfeited on his appeal. (*People v. Randle* (2008) 43 Cal.4th 76, 116, 121, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

To avoid this result, Mauricio argues his trial counsel was ineffective in failing to argue that Mauricio only waived his *Miranda* right to remain on selective issues. In order to resolve his claim of ineffective assistance of counsel, we will address Mauricio's *Miranda* claim within the rubric governing claims for ineffective assistance of counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668; see, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 215.) Under this rubric, we consider whether trial counsel performed deficiently in failing to assert the ground for objection argued on appeal, and whether it is reasonably probable that making such an objection would have resulted in different outcome at Mauricio's trial. We find no ineffective assistance of counsel because, if a "selective *Miranda* waiver" ground had been asserted below, the trial court would have properly denied the objection.

### D. The Interviews

#### i. Mauricio's Initial Interview on December 5, 2006

As noted above, deputies arrested Mauricio on December 4, 2006, when they found him and fellow gang members, one of whom was holding a rifle, in a car near Holly and Locust. On December 5, 2006, Mauricio gave a statement implicating himself and the others in the car, along with Victor Preciado, in a conspiracy to shoot any Holly Hood Pirus gang member that he and his cohorts in the car had been able to find. There was no objection to this interview at trial, and no claim or showing on appeal that this interview was improperly admitted.

9

### ii. Mauricio's Second Interview on December 21, 2006

As noted, Detectives Schoonmaker and Lowe were investigating the double murder at the bus bench while Mauricio's conspiracy case was pending. On December 21, 2006, Detective Schoonmaker interviewed Mauricio at Los Padrinos Juvenile Hall as a person who possibly had information about the murders. At the start of the interview, the detective explained to Mauricio that he was "working on a couple of cases in Compton," and that he was "wondering if [Mauricio] knew anything about one of 'em. [T]he two Bloods that were killed at the bus bench on Rosecrans?"

Mauricio said that he had overheard someone talking about the shooting. Detective Schoonmaker asked Mauricio if he was in the car when Preciado did the shooting. Mauricio denied any involvement. The detective then asked Mauricio if he ever heard "Tony Boy," i.e., Victor Preciado, bragging about the shooting. Mauricio told Detective Schoonmaker that Tony Boy had claimed credit for shooting "two Die-rus," "a girl and a boy," at a bus bench. Mauricio said Preciado used a "big gun" (a rifle) that was "[l]ike the one we . . . got caught with." In response to this comment, Detective Schoonmaker said, "I don't know about that and I'm not even here for that so, I'm not going to use anything against you." Detective Schoonmaker questioned Mauricio about what kind of weapon Preciado had used – whether a shotgun or an assault-type rifle had been employed. When the detective asked whether Preciado had mentioned anyone else's name as being involved, because there had to be "somebody driving and somebody shootin'," Mauricio said he did not recall. Detective Schoonmaker then asked Mauricio if he had been driving, and Mauricio again denied any involvement. At the end of the interview, Detective Schoonmaker told Mauricio that he was good friends with Detective Hecht who was working on Mauricio's conspiracy case arising from the stop in the car with the rifle. Detective Schoonmaker said that if what Mauricio had stated turned out to be true and if Mauricio had any other information that would help solve a double murder, then he would put in a "good word" on Mauricio's behalf with Detective Hecht.

10

### iii. Mauricio's Third Interview on January 10, 2007

On January 10, 2007, LASD Detectives Michael Caouette, Karen Shonka, and Peter Hecht interviewed Mauricio at Los Padrinos Juvenile hall. The transcript which was reviewed by the trial court, and which is before us on appeal, suggests that the transcription began after the interview was already underway.**8** It does not show any *Miranda* warnings given to Mauricio.

During the interview, Mauricio admitted he was the driver of the car used in the shooting at Lueders Park. Mauricio stated that Preciado was the shooter, and Daniel Riley ("Tilt") was in the front passenger seat. Mauricio continued to deny any involvement in the bus bench shootings. Mauricio said that on the day he was arrested while going out to shoot a Holly Hood Pirus gang member, it was Preciado's idea to do a shooting.

### iv. Mauricio's Final Interview on February 5, 2007

On February 5, 2007, after Mauricio's conspiracy case had been resolved, he was interviewed by Detectives Brian Schoonmaker and Kevin Lowe. At the beginning of the interview, Detective Schoonmaker advised Mauricio of his *Miranda* rights, and asked Mauricio whether he knew those rights. Mauricio answered, "Yes, sir." Detective Schoonmaker then explained: "Basically, I wanted to ask you a couple of questions *about what we already talked about*. [Do you] want to answer my questions *about that*?"**9** (Italics added.) Mauricio answered: "Yes." The detective explained that when "[d]oing an investigation, especially a double murder," it was common to talk to "a whole bunch of people," and then "circle around" and ask the same people more questions to get more information. Detective Lowe then added that Victor Preciado was "locked up," and had given "some information which [did not] match the information [Mauricio] gave . . . .

---

**8**    The transcript jumps right in with questions that appear to be follow-up to earlier, nontranscribed questions.

**9**    When Detective Schoonmaker interviewed Mauricio on December 21, 2006, the detective had specifically explained to Mauricio that he (the detective) wanted to know whether Mauricio knew anything about the double murder at the bus bench in Compton.

11

So somebody's bullshittin.' " Detective Schoonmaker continued: "Well, the problem what it is for you, is that Victor changed the story around a little bit and put you in the car. [¶] . . . [¶] . . . That's what we gotta get straightened out." Detective Lowe directly asked Mauricio: "You understand what case we're here on, right? 'Cause there's different shootings, we're here on the double. At the bus bench." And Mauricio answered: "I know."

Detective Schoonmaker then explained that Preciado was "putting himself in the car," and that he was also was putting Mauricio in the car. The detective asked Mauricio, "[W]hy is Victor putting you in the car . . . ?" and asked Mauricio, "[W]hat's the real story?"

At that point, Mauricio said that he was not in the car with the shooters, but that he was in another car following the shooters' car. Mauricio explained that he was driving Preciado's Impala, and Riley was in the front passenger seat with Mauricio. There were no guns in the Impala. Gerald Edwards ("Man") was driving a gray Taurus that Mauricio believed had been stolen to be used in a shooting. Preciado was in the front passenger seat of the Taurus with a shotgun, and "Chris" was in the back seat of the Taurus with a rifle. Mauricio followed the Taurus. All of the sudden, the Taurus made a U-turn and approached the bus bench. Mauricio saw two people on the bus bench and knew they would be targets. Preciado and Chris fired. Mauricio sped away, followed by the Taurus. After both cars got back to Preciado's house, Preciado, Chris, and Edwards talked about how they thought they shot gang members from Lueders Park and Holly Hood. Preciado said he had wanted to retaliate against the Pirus for "hitting" up Preciado at his house. Before the shooting, Mauricio, Preciado, Riley, and Edwards had gone out in Preciado's Impala to steal the Taurus.

During the course of the interview, Mauricio also admitted his involvement in the Lueders Park driveby. Mauricio said that, for that shooting, he drove Preciado's Impala, and Preciado was in the front passenger seat. Riley was in the rear seat. Preciado had the rifle and was the shooter. Mauricio pulled up next to the victim, who was riding a

12

bicycle, and slowed down so Preciado could get a shot. Mauricio heard three to four shots. Mauricio claimed that he had been a Ward Lane Crip for three years.

**E. Analysis**

Mauricio contends the record demonstrates that at the time of his final interview on February 5, 2007, he "invoked his right to remain silent on all topics except what he previously discussed with [Detective] Schoonmaker in his first interview" on December 21, 2006. Namely, "*Preciado*'s involvement in and motive for the bus bench shooting." Mauricio argues that, because he "had not agreed to talk about anything new" at the time of the interview on February 5, 2007, Detectives Schoonmaker and Lowe "should have ceased questioning" on the subject of *Mauricio*'s suspected involvement in the murders, "or obtained a valid waiver" which covered any questions concerning Mauricio's involvement in the murders. Mauricio argues the trial court erred in making a finding that Mauricio gave a valid waiver of his *Miranda* rights related to investigatory questions regarding *his* involvement in the murders. We disagree.

During the second interview on December 21, 2006, Detective Schoonmaker talked to Mauricio about the bus bench murders and particularly about Preciado's involvement in the shooting. The detective asked whether Mauricio had been involved, and he denied any involvement. Detective Schoonmaker told Mauricio that, if his information turned out to be true, then the detective would put a good word with the detectives working on Mauricio's conspiracy case. During the interview on February 5, 2007, Detectives Lowe and Schoonmaker told Mauricio they were there to talk to him "*about what we already talked about*." (Italics added.) In other words, they wanted to talk about the bus bench murders. Moreover, the detectives told Mauricio that the information which he had given did not mesh with a statement given by Preciado. The detectives said Preciado had put Mauricio in the car, and that they wanted to "straighten[] out" who was "bullshitting." Detective Lowe directly and specifically told Mauricio that the detectives were there to ask questions about the double murders at the bus bench. Mauricio expressly stated that he understood. We simply disagree with Mauricio that there is a factual basis for finding that he only waived his *Miranda* right as to subjects

13

apart from his involvement in the bus bench murders, and that he had only agreed to talk about Preciado's involvement in the murders. In our view, there is only one reasonable conclusion to be drawn from the record, and that is that Mauricio agreed to talk the detectives about his involvement or his noninvolvement in the murders so that matters could be straightened out. That Mauricio implicated himself does not tend to suggest that he had not expressly agreed to talk about role in the murders.

We disagree with Mauricio that his case is like *United States v. Soliz* (9th Cir. 1997) 129 F.3d 499 (*Soliz*), and/or *United States v. Lopez-Diaz* (9th Cir. 1980) 630 F.2d 661 (*Lopez-Diaz*). In *Soliz*, the defendant expressly agreed to make a statement "regarding [his] citizenship," and, when officers indicated they were going to ask questions about his "activities," he stated he "thought this was just about my citizenship." (*Soliz*, *supra*, at p. 501.) The Ninth Circuit found the defendant gave a valid *Miranda* waiver only as to the issue of citizenship. (*Soliz*, *supra*, at pp. 501, 503.) In *Lopez-Diaz*, the defendant made an express statement that he did not want to talk about drugs in a van in which he had been arrested, but officers asked about drugs anyway. (*Lopez-Diaz*, at p. 663.) The Ninth Circuit found the defendant had not given a valid *Miranda* waiver on the subject of drugs. In Mauricio's current case, he did not make any express statement that he only wanted to talk about Preciado's involvement in the murders, nor did he make any express statement that he did not want to discuss his own involvement.

Mauricio's argument that he made comments at the start of the February 5, 2007 interview that he did not want to talk about "new information," but only information on matters "previously discussed," is not persuasive for two reasons. First, there is no plain and unambiguous statement by Mauricio indicating that he wanted to limit the interview in any particular manner. (*Berghuis v. Thompkins*, *supra*, 130 S.Ct. at p. 2260.) Second, Mauricio had discussed the subject of his role in the murders during the first interview, albeit only to a limited extent. And Detective Schoonmaker, during the earlier interview, had indicated that Mauricio's information would be checked. He said that if it was accurate, then the detective would put in a good word for Mauricio on his conspiracy case. When Detectives Schoonmaker and Lowe returned later for the February 5, 2007

14

interview, we simply do not see that Mauricio attempted to frame only a selective scope of inquiry by the detectives, nor do we see that his answers suggested he wanted to limit the scope of the interview only to selected subjects.

We reject Mauricio's argument the record establishes that the detectives employed a deliberate "two-step" interrogation process that violated *Miranda*. (*Missouri v. Seibert* (2004) 542 U.S. 600, 622.) At the first interview by Detective Hecht on December 5, 2006, Mauricio was given and waived his *Miranda* rights and spoke about the conspiracy crime. At the second interview on December 21, 2006, Detective Schoonmaker talked to Mauricio as a potential witness in the bus bench shooting. The third interview on January 10, 2007, by different detectives, was problematic and cannot be reconciled with *Miranda*, but it was not used at trial in any event. That brings us to the final interview on February 5, 2007, by Detectives Schoonmaker and Lowe. This interview took place after Mauricio's conspiracy case was concluded; it was separate in time; the detectives gave proper *Miranda* advisements, and Mauricio waived his rights. The detectives specifically explained that they were there to talk to Mauricio about the bus bench shooting. The record shows an independent interview, with the proper *Miranda* procedures, not a second part of a two-step interrogation which followed a problematic first step.

## II.    The LWOP Issue

Mauricio contends the trial court erred in declining to exercise its discretion to sentence him to terms of 25 years to life, rather than LWOP. As noted above, we address this issue in light of the Supreme Court's directive that we re-examine Mauricio's LWOP sentences in light of *Miller, supra,* 132 S.Ct. 2455. We now turn to that issue.

### *Miller*

In *Miller*, the United States Supreme Court addressed the issue of whether state sentencing schemes that imposed a mandatory LWOP sentence on any defendant convicted of capital murder, without regard for whether the defendant committed the murder when he or she was a juvenile, violated the Eighth Amendment's prohibition on cruel and unusual punishments. The Supreme Court ruled that the Eighth Amendment prohibits a sentencing scheme that mandates imposition of a LWOP sentence on an

15

offender who committed a murder as a juvenile.  (*Miller, supra*, 132 S.Ct at p. 2469.)
*Miller* holds that, in a capital murder case involving a juvenile offender, a sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  (*Ibid*., fn. omitted.)

In reaching the conclusion that imposition of a mandatory LWOP sentence upon a juvenile who commits a capital murder constitutes cruel and unusual punishment, *Miller* reasons:  "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth — for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys."  (*Miller, supra*, 132 S.Ct. at p. 2468.)

*Miller* expressly states that it did "not foreclose" the issue of the constitutionality of an LWOP sentence upon "'the rare juvenile offender whose crime reflects irreparable corruption.'"  (See *Miller, supra*, 132 S.Ct. at p. 2469, quoting *Roper v. Simmons* (2005) 543 U.S. 551, 573.)  In a concurring opinion, Justice Breyer, joined by Justice Sotomayor, "added" his view that the Eighth Amendment bars an LWOP sentence when a juvenile is convicted of felony-murder, and the evidence establishes that he or she "did not kill or intend to kill."  (*Miller, supra*, 132 S. Ct. at pp. 2475-2477.)

*Analysis*

California sentencing law is unlike the sentencing laws reviewed in *Miller*. Under section 190.5, subdivision (b), the penalty for a defendant convicted of first degree murder with one or more special circumstances found true, who was 16 years of age or older and under the age of 18 years at the time of the commission of the murder, "shall be

confinement in the state prison for [LWOP] or, *at the discretion of the court, 25 years to life*." (Italics added.) Under section 190.5, LWOP is the statutorily-identified presumptive punishment for a 16- or 17-year-old special circumstance murderer, but a sentencing court may, in its discretion, for good reason found, impose a less severe sentence of 25 years to life. (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1089; *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141-1142.)

The question for us to decide then is to what extent, if any, does *Miller* undercut the vitality of the California rule that LWOP is the presumptive sentence for 16- and 17-year olds who commit special circumstances murder under section 190.5? We acknowledge that the courts of appeal have been split on this question and the issue is currently before the California Supreme Court in three cases. (*People v. Siackasorn* (2012) 211 Cal.App.4th 909; *People v. Moffett* (2012) 209 Cal.App.4th 1465; and *People v. Gutierrez* (2012) 209 Cal.App.4th 646.) The interpretation of section 190.5 in light of *Miller* remains unsettled for now.

We need not decide the issue, however, because the Attorney General acknowledged at oral argument that remand for a new sentencing hearing in light of the United States Supreme Court's opinion was a good idea in this case. We will follow her lead. *Miller* changed the focus of the sentencing decision; it "requires" trial courts "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra,* 132 S.Ct 2455, 2469, fn. omitted.) The trial court here certainly was aware that it had discretion to impose a term of 25 years to life, rather than LWOP. But that discretion was exercised through the LWOP presumptive sentence filter of *People v. Ybarra* , *supra*, 166 Cal.App.4th 1069, 1089 and *People v. Guinn*, *supra,* 28 Cal.App.4th 1130, 1141-1142. We are in no position to say how *Miller* might have affected the trial court's decision; we remand in light of the Attorney General's acknowledgment that giving the trial court the opportunity

17

in the first instance to sentence Mauricio in light of *Miller* is a reasonable path to follow. We express no opinion on whether *Miller* compels a particular sentence in this case.[10]

## III. The Parole Revocation Fine Issue

Mauricio contends, the People concede, and we agree that the trial court erred in imposing a parole revocation fine under section 1202.45 because he was sentenced to LWOP terms on all three murder counts. (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.) This issue, of course, is subject to the outcome of resentencing.

## IV. The Restitution Fine Issue

Mauricio contends, the People concede, and we agree that the trial court erred in imposing a restitution fine under section 1202.4 in the amount of $30,000. (See *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1534 [the maximum restitution fine that may be imposed in a criminal prosecution is $10,000 regardless of the number of victims or the counts involved].)

## V. The DNA Fine Issue

Mauricio contends, the People concede, and we agree that the trial court erred in imposing a "DNA fine" under Government Code section 76104.7 on each count. (*People v. Valencia* (2008) 166 Cal.App.4th 1392, 1396.)

## VI. The Custody Credits Issue

Mauricio contends he is entitled to credits for an additional 38 days of presentence actual days in custody. Although upon resentencing, Mauricio will have been entitled to additional presentence credit due to the passage of time, for the benefit of the trial court, we observe that his present argument is without merit.

Mauricio was arrested on December 4, 2006, when he was found in a car with other gang members and a rifle. A conspiracy case was initiated. He contends that his custody credits in his current triple murder prosecution case should have been calculated from December 4, 2006, even though he was not in custody for any murder offense at that time. We find Mauricio's argument is incorrect. "[C]redit shall be given only where

---

[10] Because we remand for resentencing we do not address Mauricio's arguments that his total sentence constitutes cruel and unusual punishment.

18

the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted." (§ 2900.5, subd. (b).) Mauricio's argument on appeal seeks custody credit for time spent as to an offense other than his murder offenses. The record does not disclose the date Mauricio was taken into custody for murder.[11] In any event, the 1,217 days of credit awarded by the trial court were applied in response to a calculation offered by Mauricio's counsel, and it does not appear to be erroneous.

## DISPOSITION

Mauricio's convictions are affirmed. The judgment is reversed and remanded for sentencing only. At the time of resentencing the trial court shall calculate fines in accordance with Parts IV and V of our opinion.

BIGELOW, P. J.

We concur:

RUBIN, J.

FLIER, J.

---

[11] Mauricio first implicated himself in the Lueders Park incident on January 10, 2007. Apparently, the court and counsel used that date as the first day Mauricio was in custody on the murder cases, given that 1,217 days passed between January 10, 2007, and his sentencing on May 11, 2010.

19