Filed 6/27/13  P. v. Reyes CA4/3
Opinion following recall of remittitur

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G039743 |
| v. | (Super. Ct. No. 05WF3659) |
| JUAN MANUEL REYES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Frank F. Fasel, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part, reversed in part and remanded for resentencing.

Marilee Marshall for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Heather F. Crawford, Deputy Attorneys General, for Plaintiff and Respondent.

This is the second opinion we have written in this case. In our first opinion, we upheld the convictions of appellant Juan Manuel Reyes and his codefendant Jesus Antonio Guerrero for first degree murder and other crimes stemming from their participation in a gang-related shooting. (*People v. Guerrero, et al.* (Mar. 16, 2010, G039743) [nonpub. opn.].) After that opinion became final, Reyes hired a new attorney and filed a motion to recall the remittitur on the basis his prior attorney was ineffective for failing to raise certain issues on appeal. We granted the motion, reinstated the appeal and ordered supplemental briefing. Although we conclude Reyes' sentence must be vacated and the matter must be remanded for resentencing, we affirm the judgment in all other respects.[1]

FACTS

On December 1, 2005, Reyes and Guerrero were 17 and 20 years old, respectively. They were also members of Hard Times, a criminal street gang that claims territory in Garden Grove, including Santiago High School. That day, Reyes "hit up" 16-year-old Abraham Ortega at the school by asking him what gang he was in. When Ortega replied "Santa Nita," a rival outfit, Reyes said, "Fuck Santa Nita, this is Hard Times." However, before anything further transpired, campus security showed up and defused the situation.

Five days later, shortly after school let out, the gangs crossed paths again. Santos Gomez arrived at the rear of the school with fellow Santa Nita members Alejandro Chavez and Danny Funes in tow. Funes crossed out some Hard Times graffiti that was on a wall and replaced it with "VSN," which stands for Varrio Santa Nita, and the words

---

[1] This opinion concerns Reyes only. It does not affect codefendant Guerrero or have any bearing on the first opinion we rendered in this case. However, because this opinion is based on the same record as the first opinion, we take judicial notice of our earlier decision and draw on it for our facts. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

"now what?" It didn't take long before the group, which soon included Ortega, drew the attention of others.

Hard Times member Juan Manzanares spotted them first. He talked to Baltazar Moreno about the situation, and the two of them tracked down Reyes, who was hanging out at the school quad with several other Hard Times members. Manzanares told Reyes about the Santa Nita members, whom he derogatorily referred to as "chonklas," and said, "[W]e are going to get them." Manzanares, Reyes and Moreno then set off to confront their rivals.

As they made their way to the back of the school, Manzanares phoned Guerrero several times. He told him where the Santa Nita members were and urged him to bring a gun to that location. But Manzanares didn't wait for Guerrero to arrive before instigating a confrontation. With Reyes and Moreno at his side, he asked Ortega where he was from. Ortega said Santa Nita, and one of his companions made a gang sign with his fingers. Moreno then yelled out, "Fuck Santa Nita, this is Hard Times," and with that, the two groups started fighting.

Santa Nita initially had a four-to-three advantage in terms of manpower, but Hard Times supporter Rene Garcia soon joined in to even the numbers. At one point during the fight, someone from Hard Times said something like, "Where the fuck is Abel?" Then Guerrero, whose nickname is "Evil," and fellow Hard Times member Armando Solano came running up to the scene. Guerrero was holding a gun, and upon seeing him, the four Santa Nita members retreated to Gomez's nearby jeep. As they started to drive away, Solano told Guerrero "not to do it here," but someone else yelled "dump on them." At that point, Guerrero fired several shots at the jeep, one of which struck and killed Ortega.

Gang expert Jonathan Wainwright testified to the rivalry between Hard Times and Santa Nita, describing them as "turf-orientated" Hispanic street gangs. He also described the criminal activities of Hard Times, explaining that gang members often

3

commit acts of violence to induce fear and achieve respect in the community. Based on the circumstances of this case, Wainwright believed Reyes acted in association with, and for the benefit of, Hard Times. In fact, he said Reyes' actions were indicative of "a classic gang hit-up which ultimately ended in a homicide."

Reyes, Guerrero, Moreno, Garcia, Manzanares and Solano were jointly charged with first degree murder, three counts of attempted premeditated murder, shooting at an occupied vehicle, shooting in a school zone and street terrorism. Gang and firearm enhancements were also charged, as was the special circumstance allegation that defendants intentionally committed the murder while they were active participants in, and to further the activities of, a criminal street gang.

Before trial, Moreno and Garcia pleaded guilty to manslaughter. Reyes, Guerrero and Solano were then jointly tried, and Manzanares was tried separately. Solano was only convicted of street terrorism, but Reyes, Guerrero and Manzanares were convicted as charged and sentenced to life in prison without the possibility of parole.[2]

I

Reyes argues his prior appellate attorney was ineffective for failing to raise certain claims on his behalf. (See generally *In re Smith* (1970) 3 Cal.3d 192, 202-203 [appellate counsel has a duty "to raise crucial assignments of error, which arguably might have resulted in a reversal"].) Those claims relate to both the jury instructions that were given at his trial and the sentence that he received. We will start with the instructional claims.

In reviewing those claims, we must keep in mind that jury instructions "'should be interpreted, if possible, so as to support the judgment rather than defeat it if

---

[2] We grant Reyes' request to take judicial notice of Manzanares' appeal in *People v. Manzanares* (Mar. 19, 2010, G040381) [nonpub. opn.]. Although our opinion in that case was not published and thus does not have any precedential value (Cal. Rules of Court, rule 8.1115(a)), it is the proper subject of judicial notice. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); *People v. Wensinger* (2012) 204 Cal.App.4th 90, 95, fn. 2; *In re Kinney* (2011) 201 Cal.App.4th 951, 954, fn. 3.)

4

they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.) We "'"assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"' [Citation.]" (*Id.* at p. 1111.) In determining whether instructional error has occurred, we must consider the record as a whole, including the specific language challenged, other instructions given, and the arguments of counsel. (*People v. Cain* (1995) 10 Cal.4th 1, 36-37; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191.) Unless there is a reasonable likelihood the jury misunderstood the challenged instruction in a manner that violated defendant's rights, we must uphold the court's charge to the jury. (*Ibid.*)

At trial, the prosecution theorized Reyes aided and abetted Guerrero in carrying out the shooting. Consistent with that theory, the trial court instructed on aiding and abetting and the natural and probable consequences doctrine. (CALCRIM Nos. 401 & 403.) Reyes does not challenge those instructions. However, he maintains the court's instructions on the special circumstance allegation were defective because they failed to inform the jury that, in order to find the allegation true, it had to find he personally intended to kill Ortega. We believe the court's instructions adequately conveyed this requirement.

Reyes and Guerrero were charged with the special circumstance allegation applicable to gang-related murders set forth in Penal Code section 190.2, subdivision (a)(22).[3] By its terms, that provision applies when "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).) This provision can be applied to both the actual killer and an aider and

---

[3] All further statutory references are to the Penal Code.

5

abettor, but only if they *both* possessed the intent to kill. (§ 190.2, subd. (c); *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1085-1086.)

Here, the court told the jury that in order to establish the special circumstance is true, "the People must prove that: Number one, the defendant intentionally killed Abraham Ortega; number two, at the time of the killing the defendant was an active participant in a criminal street gang; number three, the defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and, number four, the murder was carried out to further the activities of the criminal street gang."

Since Guerrero is the person who "killed Abraham Ortega," Reyes argues it is likely the jury applied this instruction to Guerrero and not him. However, the trial court instructed the jury, "The word defendant applies to each defendant unless you are instructed otherwise." The jury was never told the word defendant in the special circumstances instruction only applied to Guerrero. Therefore, it is not likely it applied the instruction in such a narrow fashion. (See generally *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 ["The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions"].)

Reyes points out that, in closing argument, the prosecutor informed the jury that Reyes did not have to share Guerrero's intent to be liable under the natural and probable consequences doctrine. Speaking to the liability of an aider and abettor under that doctrine, the prosecutor stated, "You don't have to share the perpetrator's intent. Mr. Guerrero may have intended all along to go out there and kill. You step into the shoes of the perpetrator. So if you . . . know he has an intent to go out and commit a battery or an assault and you facilitate that, you step into the shoes of the perpetrator and we get this extended liability. Natural and probable consequences."

In light of this argument, Reyes fears the jury may have applied the natural and probable consequences doctrine to the special circumstances allegation and found the

allegation true as to him without finding he possessed the requisite intent to kill. However, in making the above argument, the prosecutor was talking about Reyes' culpability on the substantive charges, more specifically his culpability for the "aiding and abetting of a murder." The prosecutor did not start discussing the special circumstances allegation until much later in his argument. (Compare *People v. Manzanares, supra*, G040381 [reversing true finding on gang special circumstance allegation as to Manzanares where prosecutor explicitly urged the jury to find the allegation true as to him based solely on the mental state of Guerrero].)

Moreover, the jury instruction on the natural and probable consequences doctrine was properly limited to the substantive charges. At no time was the jury ever told it could apply the doctrine to the special circumstances allegation, and we do not believe it is reasonably likely the jury did so. Considering the instructions as a whole, we are convinced that, in finding the special circumstances allegation true as to Reyes, the jury necessarily determined he possessed the requisite intent to kill. There is no basis for disturbing the jury's finding in that regard.

II

Next, Reyes contends the court's instructions on self-defense and the defense of others were unduly restrictive in terms of describing the law on antecedent threats. Although the jury was instructed to consider whether the victim Ortega threatened or harmed Guerrero in the past in deciding whether Guerrero's conduct and beliefs were reasonable, Reyes claims the instruction did not go far enough because it did not allow the jury to consider prior threats that were made by Ortega's fellow gang members in assessing the reasonableness of Guerrero's actions. The argument fails on several grounds.

First, there is no evidence Guerrero ever received any prior threats from Ortega's fellow gang members.

7

Second, the underlying legal premise of Reyes' argument is faulty. He assumes he was entitled to the benefit of any defenses that were applicable to Guerrero, the shooter. However, an aider and abettor does not get the benefit of defenses that are pertinent only to the person who carries out the crime. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122 [aider and abettor could properly be convicted of murder even if actual perpetrator acted in unreasonable self-defense and was thus guilty only of manslaughter].) Therefore, even if there had been evidence that Guerrero had received prior threats from Ortega's fellow gang members, that evidence would not necessarily mitigate Reyes's culpability.

Third, the record belies Reyes' claim the court's instructions on antecedent threats was limited to threats made by Ortega. Pursuant to CALCRIM No. 505, the court instructed the jury the defendant was justified in using deadly force if he reasonably believed he or someone else was in imminent danger of being killed or suffering great bodily injury. As part of that instruction, the court stated, "If you find that Abraham Ortega threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. If you find that the defendant knew that Abraham Ortega had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable."

Although Ortega was the only person specifically identified in the above instructions, the court gave other instructions that expanded on the antecedent threats doctrine. Particularly, the court told the jury, "Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person. [¶] If you find the defendant received a threat *from someone else that he reasonably associated with Abraham Ortega*, you may consider that threat in deciding whether the defendant was justified in acting in self-defense or defense of another."

8

These instructions clearly signaled to the jury that Ortega was not the only person whose prior threats may have mattered in the case.  Rather, the jury could also consider the effect of any threats the defendant may have received from anyone whom he reasonably associated with Ortega, which would logically include his fellow gang members.

Reyes contends that, as worded, the instructions only pertained to the situation where the defendant acted against the particular person who had actually threatened him.  But the final sentence of the instruction was worded more broadly than that.  By its terms, it allowed the jury to consider threats the defendant received *from Ortega's associates* in determining whether his actions *against Ortega* were justified.  Therefore, the instructions were not unduly restrictive.  They did not violate Reyes' rights in any respect.

### III

We now turn to Reyes' sentencing claims.  Since he was convicted, the contours of the law respecting juvenile sentencing have been reshaped by a series of watershed cases.  Eighth Amendment decisional law now restricts the type of sentence a juvenile offender may receive in some circumstances.  Because Reyes was only 17 years old when this case arose, we will vacate his sentence and remand the matter so he can be resentenced in light of these decisions.

Reyes was sentenced on December 14, 2007.  For the crime of first degree murder with the gang-related special circumstance, the court sentenced him to life in prison without the possibility of parole (LWOP).  (§ 190.2, subds. (a), (c).)  Because Reyes vicariously discharged a firearm that caused death, the court imposed a consecutive enhancement of 25 years to life on that count.  (§ 12022.53, subds. (d), (e)(1).)  The court then imposed consecutive life terms, plus 20-year enhancements for vicariously discharging a firearm, on each of the three counts of attempted premeditated murder.  (§§ 664, subd. (a), 12022.53, subds. (c), (e)(1).)  And because the shooting was

9

gang-related, the court also ruled Reyes must serve a minimum of 15 years in prison before he is eligible for parole on those counts. (§ 186.22, subd. (b)(5).)

On the remaining three counts, the court stayed Reyes' sentence pursuant to section 654. Thus, as reflected in the abstract of judgment, the court sentenced Reyes to a total term of LWOP "plus 3 indeterminate sentences of life with the possibility of parole after serving a minimum of 15 years as to each count, plus 85 years to life."

It is undisputed that one aspect of Reyes' sentence is incorrect. Because he was not the actual shooter, he could not be subjected to both the 20-year enhancement per section 12022.53, subdivisions (c) and (e)(1) plus the 15-year minimum parole eligibility period set forth in section 186.22, subdivision (b)(5). (*People v. Brookfield* (2009) 47 Cal.4th 583; *People v. Gonzalez* (2010) 180 Cal.App.4th 1420.) On remand, the trial court must bear that in mind when resentencing Reyes.

The main reason the matter must be remanded, however, has to do with the Eighth Amendment, which prohibits "cruel and unusual punishments." (U.S. Const., 8th Amend.; see also Cal. Const., Art. I, § 17 [proscribing the infliction of cruel or unusual punishment].) Three years after appellant was sentenced, the United States Supreme Court held in *Graham v. Florida* (2010) 560 U.S. __, __ [130 S.Ct. 2011, 2034] (*Graham*) that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."

"The gist of *Graham* is not only that life sentences for juveniles are *unusual* as a statistical matter, they are *cruel* as well because 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds' [citation], '[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults' [citation], and that accordingly, '"a greater possibility exists that a minor's character deficiencies will be reformed"' [citation.]" (*People v. Caballero* (2012) 55 Cal.4th 262, 272 [110-year-to-life sentence imposed on a juvenile offender for

a nonhomicide offense is the functional equivalent of a LWOP sentence and thus violates the Eighth Amendment]; see also *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*) [because juveniles are generally less mature, responsible and culpable than adults, they cannot be subjected to capital punishment].)

*Graham* is factually inapt here, given that Reyes was convicted of murder. However, in *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*), the high court extended the reasoning of *Graham* to the situation presented in this case, where a juvenile offender is convicted of homicide. Although *Miller* did not categorically prohibit LWOP sentences for juveniles who commit homicide, it ruled the Eighth Amendment prohibits *mandatory* LWOP sentences for such offenders. (*Id*. at p. __ [132 S.Ct. at p. 2469].)

In so ruling, the *Miller* court stated that "given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469], fn. omitted.)

Because Reyes' sentencing predated *Graham* and *Miller*, the trial court obviously did not have the benefit of those decisions. As a matter of fact, in sentencing Reyes, the court did not mention anything about his age or his prospects for reform. Instead, the court appears to have presumed LWOP was the only sentencing choice available given Reyes was convicted of special circumstances murder. At sentencing, the

11

court told him, "Most gang murders are senseless because there is no point in it. So none of this will ever stop until young people like yourself decide not to get involved in a gang. And, that's probably wishful thinking. [¶] In any event, since you have been found guilty by the jury of first degree murder with special circumstances to be true, as relates to count 1, you are committed to state prison for a term of life without the possibility of parole."

The Attorney General points out that pursuant to section 190.5 the trial court did have the discretion to sentence Reyes to 25 years to life in prison instead of LWOP. Indeed, that section provides, "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in state prison for life without the possibility of parole *or, at the discretion of the court, 25 years to life.*" (§ 190.5, subd. (b), italics added.)

Seeing that section 190.5, subdivision (b), empowered the trial court to sentence Reyes to 25 years to life, the Attorney General argues California sentencing law does not run afoul of the holding in *Miller*, which prohibits *mandatory* LWOP for juvenile homicide offenders.[4] However, case law has interpreted section 190.5, subdivision (b), as making LWOP the "presumptive punishment" and "generally mandatory" sentence for juveniles who commit special circumstances murder. (*People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141-1142; accord, *People v. Ybarra, supra,* 166

---

[4] The California Supreme Court is currently considering this issue. (See *People v. Siackasorn* (2012) 211 Cal.App.4th 909, review granted Mar. 20, 2013, S207973; *People v. Moffett* (2012) 209 Cal.App.4th 1465, review granted Jan. 03, 2013, S206771; *People v. Gutierrez* (2012) 209 Cal.App.4th 646, review granted Jan. 03, 2013, S206365.)

Cal.App.4th at p. 1093.)  That interpretation of the statute is directly at odds with *Miller*'s holding that LWOP sentences for such offenders should be the exception and not the rule.

Beyond that, there is nothing in the record to suggest the trial court actually knew it could sentence Reyes to 25 years to life.  This prospect was not brought up in Reyes' presentencing probation report or mentioned by counsel at time of sentencing.  And to make matters worse, the prosecution's sentencing brief incorrectly stated that LWOP was the only available sentencing option on the special circumstances murder count.  Judging by the court's above-quoted comments at the sentencing hearing, that is apparently what the court believed, as well.

This record strongly suggests "a lack of awareness by the court and counsel alike of the discretion that section 190.5, subdivision (b) confers to impose on a youthful offender a 25-year-to-life term instead of an LWOP term." (*People v. Ybarra, supra,* 166 Cal.App.4th at p. 1093.)  Under these circumstances, Reyes' sentence must be vacated and the matter remanded for resentencing.  (*Id*. at p. 1094.)

On remand, the trial court must not only consider the standard aggravating and mitigating circumstances listed in the rules of court and section 190.3.  (See *People v. Ybarra, supra*, 166 Cal.App.4th at pp. 1089-1094.)  Per *Miller*, the trial court is required "to take into account how children are different [from adults], and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469], fn. omitted.)  That way, the court can make a fully informed decision as to whether LWOP or 25 years to life is the appropriate sentence for Reyes.

The court is also free to reconsider other aspects of Reyes' sentence, e.g., consecutive versus concurrent terms, in determining the most suitable punishment for him.  We offer no opinion on what that may be but instead leave it to the trial court in the first instance to make that call based on all of the relevant considerations, which we are not well situated to evaluate.  (Cf. *People v. Thomas* (2012) 211 Cal.App.4th 987, 1013-

13

1015 [reversing juvenile's de facto LWOP sentence and remanding matter for resentencing with instructions for trial court to consider impact of *Miller* and other recent Eighth Amendment cases]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1480-1482 [same].)

## DISPOSITION

Reyes' sentence is vacated and the matter is remanded so he can be resentenced consistent with the views expressed herein. In all other respects, the judgment is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.

14