Filed 3/11/14  P. v. Salazar CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KEVIN SALAZAR,<br><br>    Defendant and Appellant. | B248385<br><br>(Los Angeles County<br>Super. Ct. No. BA394464) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Modified in part and affirmed in part with directions.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

A jury convicted defendant, Kevin Salazar, of two counts of attempted willful, deliberate and premeditated murder.  (Pen. Code, §§ 187, 664, subd. (a).)[1]  The jury found true gang benefit and firearm use allegations.  (§§ 186.22, 12022.53, subds. (b), (c) & (d).)  Defendant was sentenced to an indeterminate term of 55 years to life plus a determinate term of 20 years.  We modify the judgment and affirm as modified.

# II.  THE EVIDENCE

The attempted murders of S.M. and A.M. occurred near Los Angeles High School.  S.M. was a student at the high school, as was Jorge Arzu.  A.M.'s brother, B.M., was also a student at the high school.  Defendant and Irving Guevara did not attend the high school.  There was evidence defendant, Mr. Arzu and Mr. Guevara were all three associates or members of a violent gang.  Although S.M. denied it,  there was also evidence he was an associate or member of a rival gang.

On the morning of February 24, 2012, S.M. argued with Mr. Arzu.  During their argument, Mr. Arzu claimed his gang and disrespected the rival gang.  S.M.'s girlfriend, A.V., was with him at the time.  A.V. also heard Mr. Arzu claim his gang and disrespect the rival gang.  Both S.M. and A.V. thought there was a gun in Mr. Arzu's backpack.  S.M. and A.V. did not actually see a gun.  But Mr. Arzu reached into his backpack in a manner that caused S.M. and A.V. to believe Mr. Arzu had a gun.  A.V. testified Mr. Arzu held his backpack close and kept reaching for something inside it.  She saw something shiny and silver sticking out of Mr. Arzu's backpack.  It looked like a hard object.  As this was happening, Mr. Arzu told S.M., "I've got something for you."  Later, a friend told A.V. to be careful because there were members of the violent gang behind the school.

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

The attempted murders occurred later the same day, as the school day ended. S.M., A.V. and B.M. crossed the street from the high school to a park where they met A.M. Defendant and Mr. Guevara suddenly appeared. Defendant confronted, chased down and shot S.M. and A.M. S.M. suffered a gunshot wound to his leg. A.M. was shot in back. The gunshot wound left A.M. partially paralyzed, unable to walk and in constant pain. The gun was never recovered.

When defendant first approached his victims, he referred to his gang. A.V. heard defendant say, "You messed with the wrong people." Mr. Guevara was with defendant at the time of the shooting. A.V. knew Mr. Guevara from middle school. She recognized him when she saw him. Eyewitnesses observed that Mr. Guevara had red lips tattooed on his neck. Mr. Guevara tried to waive A.V. away. Instead of leaving, A.V. tried to talk to defendant. She told defendant to stop. Defendant asked her which one of her companions was her boyfriend. A.V. told defendant it was none of his business. Defendant told A.V. it did not matter because he was going to kill both of them. After the shooting, A.V. saw Mr. Arzu come out from behind a bush close to the high school. Mr. Arzu followed defendant and Mr. Guevara as they ran away.

The three eyewitnesses—S.M., B.M. and A.V.—did not know defendant prior to the incident. But they saw him face-to-face at the time of the assault. He was only a few feet away. And the three eyewitnesses repeatedly and consistently identified defendant as the assailant.

S.M. identified defendant, Mr. Arzu and Mr. Guevara. S.M. testified he looked directly at defendant during the argument. S.M. was face to face with defendant. Defendant was only a few feet away. S.M. saw defendant's face. On February 27, 2012, three days after the shooting, Detectives Michael Boyle and Daniel Talbot visited S.M. By this time, S.M. was at home. The detectives showed S.M. a photographic lineup. S.M. quickly, within 10 to 15 seconds, identified defendant as the person who fired the shots. Detective Boyle testified, "[S.M.] identified [defendant] as the person that shot him as well as his friend [A.M.]" S.M. wrote, "Number 5 was the one who shot at me and my friend [A.M.]." S.M. also identified Mr. Arzu and Mr. Guevara. S.M. wrote, "[Mr.

3

Arzu] was the one who pulled out a gun during school hours." S.M. also wrote, "[Mr. Guerra] was with the shooter at the time this happen[ed]." S.M. identified defendant at the preliminary hearing and at trial. On cross-examination at trial, S.M. agreed that of the six photographs in the photographic lineup, defendant was the only person whose hairstyle was similar to that of the gunman.

A.V. identified defendant, Mr. Arzu and Mr. Guevara. A.V. repeatedly identified defendant as the person who fired the shots. During the argument, A.V. had been within a few feet of defendant. A.V. had talked to defendant. The first time A.V. identified defendant was at the police station on the day of the shooting. Detective Ronald Cade showed A.V. an individual photograph of defendant. A.V. testified she identified defendant as the gunman immediately. A.V. said she recognized defendant's face. A.V. wrote, "The photo that I saw is the same person that shot [S.M.] and [A.M.] with the gun." Detective Cade testified A.V. identified defendant as the gunman "real quick." A.V. did not hesitate at all.

Three days later, on February 27, 2012, Detectives Boyle and Talbot went to Los Angeles High School. The detectives showed A.V. three photographic lineups. A.V. identified defendant as the person who shot the victims. A.V. also identified Mr. Arzu and Mr. Guevara. On cross-examination, A.V. admitted that when she first saw the photographic lineup, no individual looked familiar. After further consideration, referring to defendant, A.V. told Detectives Boyle and Talbot: "Maybe this one. Okay. His hair was a little bit shorter. . . . I think [he's] the shooter."

Also on or about February 27, 2012, Detective Cade visited A.V. at home. Detective Cade showed A.V. a photographic lineup. Again, A.V. identified defendant without hesitation. After identifying defendant A.V. wrote, "No. 4 [defendant] is the guy who shot [S.M.] with the gun." A.V. testified she identified defendant quickly, when she saw his face; there was no question in her mind. A.V. identified defendant at the preliminary hearing and again at trial.

A.M.'s brother, B.M., testified it was defendant who fired the shots. B.M. saw defendant shoot A.M. from a distance of 15 feet. On February 27, 2012, when Detectives

4

Boyle and Talbot visited the high school, B.M. identified defendant, Mr. Arzu and Mr. Guevara.  B.M. identified defendant as the person who fired the shots.  When shown the photographic lineup, B.M. told the detectives, "This guy looks like the shooter."  B.M. wrote:  "Number 5 [defendant] appears to be the shooter . . . that shot my brother in the back.  He also shot [S.M.] in the left leg on his knee."  B.M. identified defendant at the preliminary hearing as well as at trial.

Cellular telephone records showed defendant, Mr. Arzu and Mr. Guevara were in communication with each other.  These communications occurred at times corresponding to S.M.'s argument with Mr. Arzu and the subsequent shooting.  Each telephone had the others' contact information in it.  At 10:20 a.m., Mr. Guevara sent Mr. Arzu a text message asking, "How many foos jumped you[?]"  Mr. Guevara sent a text message to someone identified only as Jenifer at 10:21 a.m.  The text message said, "I'm a go to your school today cause my homies got . . . jumped."  At 10:23 a.m., the person only identified as Jenifer responded:  "Who's your homie?  Who jumped him?"  Further text messages between Mr. Guevara and a female gang member identified only as "Giggles" referenced an altercation involving Mr. Arzu and a rival gang.  At 2:17 p.m., Mr. Guevara texted the person identified only as Giggles:  "Sorry I can't make it.  They jumped [Mr. Arzu] and we going to his school."  Giggles asked, "Who jumped [Mr. Arzu]."  Mr. Guevara responded, "Foo, they left his face ugly as fuck."  At 2:43 p.m., Mr. Guevara texted Giggles, "Waiting for the bus to go to L.A. High."

The defense rested on misidentification.  Mr. Hammond cross-examined witnesses extensively with respect to the eyewitness identifications.  Dr. Robert Shomer testified for the defense.  Dr. Shomer was a research psychologist.  He testified concerning perception and memory and the unreliability of eyewitness identifications.

## III.  DISCUSSION

### A.  Defendant's Mistrial Motion

Defendant sought a mistrial in the trial court due to the admission of certain evidence over defense objection.  On appeal, defendant contends the trial court abused its discretion in denying his mistrial motion.  Defendant further asserts the trial court's ruling denied him due process under the federal Constitution.  Defendant's argument rests on testimony from Officers Joshua Rider and Edgar Muro.  We find no due process denial.

Officer Rider was among the first law enforcement personnel to arrive at the scene of the shooting.  Officer Rider spoke with witnesses including A.V.  Officer Rider conducted a field showup during which A.V. identified Mr. Arzu.  A.V. identified Mr. Arzu as the person who had fought with S.M. earlier that day.  Officer Rider testified, "[A.V.] stated that [Mr. Arzu] was the person who had brought a gun into school that day."  Deputy District Attorney Angela Jordan subsequently asked Officer Rider to clarify:  ". . . [W]hat I'm trying to make clear is who [A.V]'s identifying when she identified this person . . . as being?"  Officer Rider responded:  "I didn't get involved into an in depth investigation.  I know the detectives were going to follow up and the officers who were there would be handling the call.  Just in general, from the story that I got—I didn't go into very big details.  *I know that* [*Mr. Arzu*] *was involved in an argument that had taken place at school and that he brought a gun into the school that was used in the shooting.  . . .*"  (Italics added.)  Alternate Deputy Public Defender Brock Hammond objected that no evidence supported Officer Rider's assertions that Mr. Arzu had a gun at school and the same handgun was used to shoot S.M. and A.M.  The trial court revisited the issue several times.  Ultimately, however, the objection was overruled.

Officer Edgar Muro subsequently testified concerning the gang issues.  Officer Muro believed Mr. Guevara was a gang member.  Officer Muro testified:  "The basis for my opinion is he showed up with - - with [defendant] to commit what I believe is a gang

6

related crime." Mr. Hammond objected: "This officer cannot assert as a fact that [defendant] was present at the school shooting. That's the whole issue in this case." The trial court overruled the objection.

Defendant argues Officer Rider's testimony was not based on personal knowledge. Defendant further asserts that because Officer Rider heard the statement from A.V., it was hearsay. (Evid. Code, §§ 702, 1200.) With respect to Officer Muro's testimony, defendant asserts, "Had [Officer] Muro based his opinion on his understanding that [Mr.] Guevara was at the scene of the shooting with a 'person' who claimed [the gang], there would be no objection; it is his statement that the other person *was* [defendant] that runs afoul of the law." Defendant concedes Officer Rider's testimony, considered alone, was not prejudicial. Defendant argues, however, that when considered in conjunction with Officer Muro's testimony, the jury was left wondering what the law enforcement officers knew that the jury did not know.

As our Supreme Court has held, "[W]e review a ruling on a motion for mistrial for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283; accord, *People v. Burgener* (2003) 29 Cal.4th 833, 873.) Further, "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' ([*People v. Haskett* (1982) 30 Cal.3d 841, 854].)" (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

Here, even if the evidence should have been excluded, it was harmless in light of the overwhelming evidence of defendant's guilt. The issue at trial was whether it was defendant who shot S.M. and A.M. or some other person was the assailant; in other words, whether defendant was misidentified as the gunman. There was overwhelming evidence of defendant's guilt including eyewitness identifications, gang affiliation and motivation and cellular telephone usage. Whether Mr. Arzu had a handgun in his backpack and defendant used that same gun to shoot the victims had no direct or significant bearing on the issue of guilt. Defendant concedes as much. And no

7

significant prejudice flowed from Officer Muro's testimony. Officer Muro's reference to defendant as the individual who committed the attempted murders was consistent with the testimony of every other law enforcement officer who testified at the trial. The jury was certainly aware that those officers believed, based on the evidence, that defendant was the perpetrator of the crimes. There was no abuse of discretion and no due process denial.

### B. Defendant's Continuance Motion

Defendant asserts the trial court abused its discretion in denying his motion to continue the trial so he could locate a witness. We find no abuse of discretion. The present trial commenced on March 12, 2013, and continued through March 22, 2013. On March 1, 2013, prior to the start of trial, Gilda Juarez appeared in court. Mr. Hammond asked the court to order Ms. Juarez to be on call. The following transpired: "The Court: Ms. Juarez, I'm going to put you on call to the defense, this attorney here Mr. Hammond. What that means is when he calls you to to [*sic*] come to court to give testimony, you're going to be ordered to come here and give testimony. [¶] Is that clear? [¶] Witness Ms. Juarez: Yes, I understand. [¶] The Court: And we do it that way [so] you don't have to wait here day after day, you'll just be called on the day you're supposed to give testimony. [¶] Is that clear? [¶] The witness: Yes, I understand."

On March 19, 2013, Mr. Hammond said he anticipated Ms. Juarez would testify the following afternoon. Ms. Juarez was defendant's adoptive mother. Mr. Hammond stated, "I will tell the court I haven't made actual contact with her, just left messages." During the following day's afternoon session, March 20, 2013, Mr. Hammond requested a body attachment issue for Ms. Juarez. Mr. Hammond advised the court: "Your Honor, I'm having a problem reaching Gilda Juarez. I have a good phone number, I don't have an address for her. She has been cooperative. She appeared in court when the court ordered her back voluntarily. And when I had spoken to her previously she was very cooperative. I had put in a call to her, I believe it was the day before yesterday, left a

8

message, and I've been leaving messages ever since and I have not heard back from her. She's a very important witness for us. At this point, I don't know what to do other than ask the court to issue a body attachment." At the end of the day, the trial court ordered a body attachment issued for Ms. Juarez. On March 21, 2013, Mr. Hammond was still attempting to locate Ms. Juarez.

On the last day of trial, March 22, 2013, Mr. Hammond noted he had been unable to secure Ms. Juarez's presence despite attempts to locate her. Mr. Hammond represented: "Gilda Juarez would have testified that [on the day of the shooting] she dropped Mr. Salazar off in certain sections of Los Angeles that are pretty far from Los Angeles High School, and that when she dropped him off he was wearing a red shirt, essentially a polo shirt with a collar and buttons on the top, and it's the shirt depicted in Mr. Salazar's booking photo[graph]. She would have testified that on the [next] morning [when] the police searched her house she was present and that, I believe, she said she saw Mr. Salazar grab the dirty red shirt from the laundry hamper and put it on." Mr. Hammond argued: "[S]ince all the witnesses have identified [the shooter as wearing] a gray or dark navy blue shirt, . . . without a collar, without buttons, the testimony about Mr. Salazar wearing a shirt both when he was dropped off and when he was picked up later in the day by Gilda Juarez would have been really, really important." Mr. Hammond noted he was continuing his attempts to locate Ms. Juarez. Mr. Hammond had attempted to leave a message for Ms. Juarez the previous morning. He encountered a recording stating the number was no longer in service. Mr. Hammond requested a continuance.

The trial court denied the continuation request. The court ruled: "Well, she talks about the red shirt. She may be subject to some impeachment because of her apparent close connection to the defendant. I understand the testimony you're trying to get in. And balancing that as against all of the other testimony identifying him, recognizing there's some issue concerning what shirt he was wearing. [¶] . . . [¶] On a continuance, it doesn't appear that there's any reliable information indicating that the witness will be able to make it to court. It's not as if [your contact] has any leads. You left messages.

9

This morning the message says that that phone is no longer in service. Notwithstanding your representations that she is cooperative and eager to testify, she has not made herself available for whatever reason. She was here before, she knew where the trial was, she had your phone number. I don't know that a continuance would be fruitful. [¶] Furthermore, we're two days beyond the day that we were going to close. We already have one juror who spoke on record yesterday about having concerns about having the trial go on a further day. It's another issue I wanted to raise with you. So given all of that, I don't think it appears to me that further delaying this trial on that evidence would be warranted. So I'll deny that."

Our Supreme Court has held: "A motion for continuance should be granted only on a showing of good cause. (§ 1050, subd. (e).) The trial court has substantial discretion in ruling on midtrial motions to continue a case, and appellate challenges to a trial court's denial of such a motion are rarely successful. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037; *People v. Beeler* [(1995)] 9 Cal.4th 953, 1003[, abrogated on another point as explained in *People v. Edwards* (2013) 57 Cal.4th 658, 704-705].)" (*People v. Seaton* (2001) 26 Cal.4th 598, 660.) Further; "When a continuance is sought to secure the attendance of a witness, the defendant must establish 'he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven.' (*People v. Howard* [(1992)] 1 Cal.4th [1132,] 1171. The court considers '"not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.'"' (*People v. Zapien* [(1993)] 4 Cal.4th [929,] 972.) The trial court's denial of a motion for continuance is reviewed for abuse of discretion. (*People v. Mickey* [(1991)] 54 Cal.3d [612,] 660.)" (*People v. Jenkins, supra,* 22 Cal.4th at p. 1037; accord, *People v. Doolin* (2009) 45 Cal.4th 390, 450.)

The trial court did not abuse its discretion in denying defendant's continuance motion. The trial had already gone longer than expected. One juror had already expressed concern about the trial interfering with a planned vacation. The witness, the defendant's adoptive mother, was aware she was expected to testify. She had appeared in court and acknowledged she understood she was on call as a defense witness. However, she never telephoned Mr. Hammond. And Ms. Juarez failed to respond to Mr. Hammond's telephone messages. Ultimately, the telephone number Mr. Hammond had for Ms. Juarez was disconnected. The trial court could reasonably conclude it was not likely Ms. Juarez's testimony could be obtained within a reasonable time if at all. No doubt, Ms. Juarez's expected testimony would have tended to support defendant's misidentification defense. But she would, as the trial court noted, have been subject to impeachment given her relationship to defendant.

## C.  Sentencing Errors

### 1.  The firearm use enhancements

The jury found defendant:  personally used a firearm in the commission of the attempted murders charged in counts 1 and 2 (§ 12022.53, subd. (b)); personally and intentionally discharged a firearm in the commission of the attempted murders charged in counts 1 and 2 (§ 12022.53, subd. (c)); and personally and intentionally discharged a firearm and proximately caused great bodily injury in the commission of the attempted murder charged in count 1 (§ 12022.53, subd. (d)).  As to count 1, the trial court imposed a consecutive 25-year-to-life sentence under section 12022.53, subdivision (d).  The trial court should also have imposed and stayed a consecutive 20-year sentence under section 12022.53, subdivision (c), and a consecutive 10-year sentence under section 12022.53, subdivision (b).  (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1122-1123, 1130; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1094.)  The judgment must be so modified.  The abstract of judgment must be amended to reflect:  the foregoing modifications to the

11

judgment; that the enhancement under section 12022.53, subdivision (d), as to count 1 is 25 *years to life*; and that the trial court imposed and stayed a consecutive 10-year sentence under section 12022.53, subdivision (b), as to count 2.

### 2. The gang enhancement

For the attempted premeditated murders charged in counts 1 and 2, the trial court imposed a sentence of life with the possibility of parole (§ 664, subd. (a)) with a minimum term of 15 years (§ 186.22, subd. (b)(5)). The trial court also *imposed and stayed* any additional term under section 186.22. The judgment must be modified to *strike* imposition of any 10-year term under section 186.22, subdivision (b)(1)(C). (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1404-1405.)

### 3. Conduct credits

The trial court gave defendant credit for 426 days spent in presentence custody. However, the trial court failed to award defendant any conduct credit. The parties agree that defendant was entitled to 63 days of conduct credit. (§ 2933.1, subd. (c); see *People v. Rosales* (2014) 222 Cal.App.4th 1254, 1261-1262.) The judgment must be modified and the abstract of judgment amended to so provide.

### IV. DISPOSITION

The judgment as to count 1 is modified to impose and stay the consecutive 10 and 20-year sentences under Penal Code section 12022.53, subdivisions (b) and (c) respectively. The judgment is further modified to strike any 10-year term imposed on counts 1 and 2 pursuant to Penal Code section 186.22, subdivision (b)(1)(C). The judgment as to presentence custody credit is modified to award defendant 63 days of

12

conduct credit under Penal Code section 2933.1, subdivision (c).  The judgment is affirmed in all other respects.  The abstract of judgment must be amended in three respects to reflect:  the modified judgment; that the enhancement under section 12022.53, subdivision (d), as to count 1 is 25 *years to life*; and that the trial court imposed and stayed a consecutive 10-year sentence under section 12022.53, subdivision (b), as to count 2.  Upon remittitur issuance, the clerk of the superior court is to prepare an amended abstract of judgment and deliver a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.

We concur:


MOSK, J.


MINK, J.*

---

\* Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13